**AMERICAN RADIATOR & STANDARD SANITARY CORPORATION,**
Plaintiff,

v.

**TITAN VALVE & MANUFACTURING COMPANY, Defendant.**

Civ. A. No. 30455.

United States District Court
N. D. Ohio, E. D.
July 12, 1956.

842

Victor DeMarco and George H. Rudolph of Jones, Day, Cockley & Reavis, Cleveland, Ohio, for plaintiff.

Morris Berick, of Halle, Haber, Berick & McNulty, Cleveland, Ohio, for defendant.

McNAMEE, District Judge.

Plaintiff, American Radiator & Standard Sanitary Corporation, hereinafter called American, seeks indemnity from defendant, Titan Valve & Manufacturing Company, hereinafter referred to as Titan, in the amount of a judgment it was required to pay Raymond Fix, who was plaintiff in an action against American in the District Court of South Dakota, and for the necessary expenses incurred in the defense of the prior action. There were two trials of the case of American Radiator, etc. v. Fix. By stipulation of the parties, much of the testimony in the second trial of that case has been received in evidence here. In the case at bar a jury was waived and the issues submitted to the court. The essential facts as shown by the record are:

Raymond Fix sustained serious personal injuries as a result of an explosion in the basement of his home in Rock Rapids, Iowa on the morning of November 9, 1950, which occurred as he was attempting to ignite the pilot light of a hot water heater manufactured by American. The evidence in the Fix case showed that the explosion and the resultant injuries to Fix were caused by the failure of the safety pilot or safety valve of the thermal unit attached to the heater to shut off the flow of gas to the main burner when the pilot was out. The thermal unit was manufactured by Titan at its factory in Cleveland, Ohio and delivered to American at its plant in Buffalo, New York, where it was incorporated into the hot water heater as a component part thereof. When American was informed by Fix of his claim, it immediately notified Titan, and when Fix filed his action against American the latter notified Titan of the pendency of the action and requested Titan to defend it. This Titan refused to do. Fix recovered a judgment against American in the sum of $30,000, and it is for this amount, plus its expenses incurred in the Fix litigation, or a total sum of $36,351.69, that American seeks reimbursement from Titan.

Fix's judgment against American rests upon the negligence of the latter in failing to exercise reasonable care in inspecting the safety valve "to determine whether it was in safe operative condition." While the negligence of American in the respect indicated is established by the verdict of the jury and the judgment entered thereon, it is the position of American in the case at bar that it has a right of recovery over against Titan upon the latter's alleged breach of its implied warranty of fitness of the safety valve, and also upon the ground of Titan's alleged primary or active negligence in manufacturing the safety pilot.

It may be helpful to an understanding of the decision reached herein to outline briefly the nature and function of the safety pilot on the thermal unit. Each thermal unit is designed to operate on liquified petroleum or bottled gas. Each unit has two thermostats, one of which is inserted in the hot water tank. This thermostat is adjustable and regulates the heat of the water. It also turns off the gas to the main burner whenever the water in the tank reaches the desired temperature. This thermostat of the heater in Fix' residence was in good working order. At the lower end of the thermal unit is another thermostat known as the safety valve or safety pilot. This thermostat is designed automatically to shut off the flow of the gas to the main burner and the pilot when the pilot light is out and a thermal tube located immediately above it and which extends into the fire box, is cooled to 900°F. or less. This lower thermostat is described by the Court of Appeals in American Radiator & Stand-

ard Sanitary Corp. v. Fix, 8 Cir., 200 F. 2d 529, 532, in part as follows:

> "At the lower end of the unit which controls the flow of gas to the burners is another thermostat or thermal tube which extends into the fire box and which, unless heated to a high temperature by the pilot flame, will, if properly adjusted, shut off all gas from both burners. In other words, this device is intended and should be adjusted to permit no gas to flow to either burner if the pilot flame is unlighted. Thus so long as the pilot flame is burning, the gas can flow to the main burner when heat is called for, but none can flow if the pilot flame is out unless the thermostat in the fire box is defective or out of adjustment. This thermostat and its component parts constitute the safety valve or safety pilot."

As indicated, one end of the thermal tube of the safety pilot extends into the fire box. The other end of this tube extends into a sealed unit of intricate mechanism containing a magnet and its keeper. Inside the thermal tube is a small piece of quartz and a smaller metal tube. If the thermal tube or any of its component parts are defective, or if the tube is not properly calibrated, then the safety valve will not stop the flow of gas to the main burner when the pilot light is out.

Shortly after the explosion the thermal unit of the hot water heater in the Fix residence was detached from the heater and delivered to Dr. Amidon, Professor of Mechanical Engineering at Iowa State College. He connected the unit with gas and conducted an operational test which showed that after the main burner and the pilot light were out, gas nevertheless continued to flow to the main burner. No attempt was made at that time to ascertain the cause of the failure of the safety valve to function. However, at a later time, in the presence of several experts, including a representative of Titan, Professor Amidon repeated his previous tests, with like results. He then disassembled the sealed portion of the thermo-

stat of the safety valve, examined each of its parts, and the adjustment or calibration of the thermal tube. None of the parts was found to be defective; but it was ascertained that the thermal tube was out of adjustment or improperly calibrated to the extent of $\frac{3}{1000}$ of an inch. It was this slight maladjustment of the thermal tube that prevented the safety pilot from performing its function. As the Court of Appeals said—

> "The evidence showed that the thermal tube, after the explosion, was found to be in perfect condition, but slightly out of adjustment." 200 F. 2d 529, 536.

For a considerable period of time prior to the trial of the Fix case, American purchased all of the thermal units incorporated into its heaters from Titan. When a shipment of units arrived at American's factory, the cartons in which these units were shipped were inspected visually for evidence of rough usage or rough handling during shipment. When such inspection disclosed damage to the cartons a further inspection was made of the thermal units contained therein. American also "spot checked" a representative number of units in the undamaged cartons. Such units as were not returned to Titan as a result of the visual inspections were placed in American's stock room. Thereafter, as the units were connected with the hot water heaters, American conducted operational tests to determine whether the pilot valves would automatically shut off the flow of gas to the burners when the pilot flame was out and the thermal tube cooled. These tests were made upon all thermal units connected with hot water heaters manufactured by American. Frequently it was disclosed by these tests that the safety valves would not work. Whenever this occurred it was the general practice of American to return the defective unit to Titan without making any further examination to ascertain the cause of the failure of the safety valve to function. On a few occasions in the early period of its purchases from Titan, when tests made by American revealed an unusually

large number of defective safety valves, Mueller, Chief Inspector of American, examined several of the units more closely and discovered broken pieces of quartz in the thermal tubes of some of the valves. This did not account for or explain the causes of all the defects that were disclosed by the tests. With these exceptions, however, it was the custom of American simply to return for replacement units which its tests had demonstrated were defective. Almost daily throughout the period of dealings between the parties there were rejections of units that failed to pass American's operational tests. At no time did the inspectors of American disassemble the sealed portion of the safety pilot to ascertain whether the thermal tube was properly adjusted. With each unit delivered to American Titan forwarded tags with printed instructions thereon. It was intended that these tags would be affixed to the hot water heaters sold by American. This was done. At the top of the tag appeared the caption—

Titan B–114–22

Titan 100% Shut Off Safety Pilot

However, the name of Titan Valve & Manufacturing Company did not appear as the maker of the safety valve. Included in the instructions on the tags was the statement, "The pilot is properly adjusted and calibrated at the factory and no further adjustment is necessary." After completing its tests American affixed its nameplate to the heaters and attached the instruction tags thereto. Mueller testified that American relied on Titan to properly adjust the safety pilot, but he also concurred in the views of the other experts that the defect in the safety valve on the Fix heater ought to have been disclosed by American's operational tests. Titan, as manufacturer of the thermal units, adjusted the tubes of the safety pilots by means of a calibrating machine and subjected the units to operational tests before delivering them to American.

It was the contention of Fix in his case against American that the safety pilot in question was defective at the time it left the factory of American at Buffalo, New York. However, there was evidence tending to show that the safety pilot of the hot water heater was in good working order when it was in the basement of the Fix residence. The heater had been installed in Fix' home in April, 1950 and was used by him until the time of the explosion on November 9, 1950. In October, 1950 one Byker lit the pilot for Fix, and from the testimony given by him as to its operative condition at that time there arose a permissible inference that the safety valve was then properly adjusted. Relying upon this testimony, American requested the court to give a special instruction to the jury that "if the jury found that at any time after the hot water heater was installed in the house occupied by Fix the safety pilot was working properly, then it has been conclusively established that the plaintiff has failed to prove that the safety pilot was inherently dangerous at the time it left the factory of the defendant, and plaintiff cannot recover in this action." This request was refused, and the jury returned a verdict against American in the sum of $30,000. Upon appeal, the Eighth Circuit Court of Appeals reversed the judgment on the ground that the District Court committed error in refusing to give the requested charge. In this connection the appellate court said, *inter alia:*

"If it was in proper adjustment when Byker lit the pilot burner in October, as the jury reasonably might have found, that, as we have previously stated, demonstrated conclusively that it was properly adjusted then and must have been in proper adjustment when it left the factory."

The second trial in the District Court was upon substantially the same evidence, the court gave the specially requested instructions to the jury, but again a verdict was returned in favor of the plaintiff in the identical amount of $30,000. In the second trial special in-

terrogatories also were submitted to the jury. These interrogatories and the answers thereto were:

"1. Was the safety valve, sometimes called a safety pilot, involved in this case defective so that it would not shut off when it was cooled at the time it reached the factory of the defendant at Buffalo, New York?

"Answer this interrogatory 'Yes' or 'No'

"Answer: Yes.

"2. In the event you answer question No. 1 'Yes', then answer this question:

"Did the same defect exist at the time it left the defendant's factory?

"Answer this interrogatory 'Yes' or 'No'.

"Answer: Yes."

The special findings were incorporated in and made a part of the corrected judgment entered by the District Court. No appeal was taken in the second Fix case. There is no evidence tending to show that American had changed or done anything to cause a change in the adjustment or calibration of the thermal tube of the safety pilot while the unit was in its possession. In view of this and as a predicate for his judgment against American it was necessary for Fix to prove, and, as shown by the record in this case, he did prove, that the safety pilot was out of adjustment when the thermal unit was delivered to American, as well as when it left the factory of American at Buffalo, New York.

 The first issue to be determined is whether Titan is liable on its alleged implied warranty of fitness. Section 1315.16 R.C. of Ohio provides in part:

"Subject to sections 1315.01 to 1315.76, inclusive, of the Revised Code and any law applicable thereto, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(A) When the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he is the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose.

\* \* \* \* \* \*

"(C) If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed."

There is no evidence of any formal contract of sale between the parties and, except as shown by the statement of facts, there is no evidence of any representation or affirmation relating to the fitness of the safety valves for the use for which they were intended. After making the described visual tests of the thermal units upon receiving them at its factory, American placed the units in its stock room and deferred its operational tests until the units were incorporated into the heaters. That this arrangement met with Titan's approval is evidenced by its long-continued policy of unquestioning acceptance of the return of safety valves which American's tests had shown to be defective. These tests were designed to discover any defects that would prevent the safety valve from working, and it is incontestable that a careful test by American of the safety valve on the heater used by Fix would have disclosed its unsafe and dangerous condition. It therefore appears beyond question that there was a defect of the safety valve which ought to have been revealed by the examination made by American.

American contends, however, that notwithstanding its tests it nevertheless relied on Titan to supply properly adjusted valves. As justification for such reliance it refers to the statement on the instruction tags that "The pilot valve is properly calibrated." This argument is not persuasive. The tags were attached to the heaters after American had completed its tests, affixed its nameplate to the heaters, and assumed responsibility for the finished product. Titan had good

reason to know that American tested each and every pilot and that the tags would not be affixed thereto until after the operational tests were completed. While the name "Titan" appeared on the tags, there was nothing to indicate that the Titan Valve & Manufacturing Company was the maker of the safety pilot. A purchaser of the heater would be fully justified in assuming that "Titan" was a trade name used by American, whose nameplate was on the heater and that the pilot was adjusted at American's factory. While Titan prepared the instructions and forwarded them to American, the latter in effect adopted them as its own. The printed matter on the tags was designed to enlighten and instruct the ultimate user of the heater. The representations that the safety valve was properly calibrated and the admonition not to make any further adjustment were obviously intended for the benefit of those who were expected to use the units without further tests. Their purpose was to prevent any tampering with the adjustment by the purchasers of American's heaters. As the manufacturer of the finished product, American knew that proper adjustment of the pilot valve was essential to its safe operation. It makes no disclaimer of knowledge that its tests, if carefully made, would disclose any defect, including faulty calibration, that would prevent the safety pilot from working. As the Court of Appeals said:

"* * * The evidence shows that if a safety pilot is improperly adjusted, so that gas can flow to the burners when the pilot flame is out, that fact is easily discoverable by simple tests."

It is a fair inference, therefore, that it was in reliance upon its own tests that American passed on to its customers the information contained on the printed tags that the safety pilot was properly calibrated at the factory. It is true that American did not open the sealed unit of the safety valve to discover whether it was properly adjusted. However, there was no need for such an examination.

As has been shown, a maladjusted pilot was a defect that American's examination ought to have revealed, and this fact is decisive against its claim of indemnity based upon an implied warranty of fitness.

To avoid the effect of the application of the provisions of subsection (C) of Section 1315.16 R.C. of Ohio, American contends that its tests were not designed to ascertain whether a safety valve would work under conditions of actual operation and that of necessity it relied upon Titan to supply valves that would meet this requirement. To support this contention American hypothesizes a situation where a safety valve slightly out of adjustment might function efficiently when subjected to tests at American's factory but would not function at all in the higher temperatures prevailing under actual conditions of operation. If a case arose where the possibility suggested by the hypothesis were actualized, American could claim reasonably that the defective adjustment was a latent defect that could not be discovered by its tests no matter how carefully made. But no such claim is available to American in the case at bar. It is settled beyond dispute, both by the testimony of the experts and the judgment in the Fix case, that the defective adjustment of the pilot valve in question constituted a defect that ought to have been discovered by American, and it is obvious that a pilot valve that would not work in American's plant could not be expected to function under actual operating conditions.

There was not the slightest justification for reliance upon Titan. The large number of defective pilots disclosed by American's tests over the entire period of its dealings with Titan was a clear and constant warning against reliance upon a supplier whose apparent want of skill was consistently demonstrated. Under the circumstances it would have been reckless for American to have relied upon Titan, and the conclusion is inescapable that it did not do so. It is not surprising that American has cited no case in which

upon analogous facts recovery has been allowed to a vendee of chattels on the basis of an implied warranty. The application of the plain provisions of Section 1315.16 R.C. of Ohio to the facts of this case compel denial of American's right to recover upon the alleged breach of implied warranty.

## Negligence

■■ Titan was notified of the action of American Radiator, etc. v. Fix, and afforded an opportunity to defend. If Titan was negligent in adjusting the safety valve and is liable over to American, it would be bound by all matters necessarily adjudicated by the judgment in the Fix case. Freeman on Judgments, 5th ed., p. 978, Sec. 447; ibid., p. 991, Sec. 450.

Proceeding on the assumption that Titan is bound by the judgment in the Fix case, including the special findings of the jury,* it appears more probable than not that the faulty calibration of the safety valve in question was due to the negligence of Titan. As the judgment in the Fix case shows, the safety pilot was out of adjustment when it arrived at the plant of American. There is no evidence that the safety valve was so handled or dealt with between the time it left the factory of Titan until it was delivered to American as to cause any change or deviation in its original adjustment. The Fix case also establishes that there was no tampering with the safety valve while the pilot was in the possession of American or thereafter such as would cause the defective adjustment. Titan calibrated the safety valve, and it appears probable, and I find, that the improper calibration was due to the negligence of Titan. Liability of a manufacturer of a component part of a chattel to a person injured by its negligence is now settled. 4 Restatement of Torts—Negligence—Secs. 393, 395, 396; Smith v. Peerless Glass Co., 259 N.Y. 292, 181 N.E. 576; Willey v. Fyrogas Co., 363 Mo. 406, 251 S.W.2d 635.

In defining the duty of American in the Fix case, the Court of Appeals said, 200 F.2d 536:

"It was the duty of the defendant to use due care in constructing the heater in suit and to see that it was equipped with a safety pilot which would completely shut off the gas from the burners when the pilot flame was out, so that the heater could safely be used for its intended purpose and would not be a menace to those who used it or were near it. It was also the duty of the defendant to make all the ordinary and necessary tests to ascertain whether the safety pilot was in proper working condition and properly adjusted before the heater left the factory."

The foregoing statement of the Court of Appeals is based upon the principles laid down in the leading case of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696.

American, of course, is bound by the judgment in the Fix case in which it was held to have been negligent in failing to discover the improper adjustment of the pilot valve. Its claim for indemnity on the ground of negligence rests upon the contention that its own negligence was secondary to that of Titan, and consisted solely of passive negligence in failing to discover the defect created by Titan's active negligence.

The cases are legion in which courts have recognized the distinction between these different grades of negligence, and in many of them indemnity has been

---

\* Not being an indemnitor, the defendant cannot be held to be concluded as to the matters adjudicated in the Fix case. However, for the purpose of disposing of all the issues raised, I have assumed that as a putative indemnitor defendant should be considered bound by the judgment in the prior case. This was done so that if the Court of Appeals disagrees with the determination here made and holds that the defendant was in fact an indemnitor, there will be no need for a further trial of the issue of defendant's negligence in making the valve.

awarded a tort-feasor whose liability was secondary to that of the primary wrong-doer. The most familiar examples are to be found in cases of master and servant, where the former was held liable on the principle of imputed negligence. Other cases involve the right of a municipality, which had been held liable for its failure to abate a nuisance, to recover indemnity against the party who negligently created the nuisance. There is also a class of cases where persons buying or renting chattels or machinery have been held liable to those injured by their use and have sought indemnity against the suppliers of the defective instrumentalities. The principle that governs a claimant's right to indemnity in the last mentioned class of cases is stated in Section 93—Restatement on Restitution, p. 407, as follows:

> "Where a person has supplied to another a chattel which because of the supplier's negligence or other fault is dangerously defective for the use for which it is supplied and both have become liable in tort to a third person injured by such use, the supplier is under a duty to indemnify the other for expenditures properly made in discharge of the claim of the third person, if the other used or disposed of the chattel in reliance upon the supplier's care and if, as between the two, such reliance was justifiable."

Also pertinent is the following portion of the Comment under Sec. 93:

> "In such cases the fact that the claimant was negligent with respect to the person harmed does not prevent him from obtaining indemnity from the supplier, *if his negligence consisted merely in failing to make an inspection and his failure was because of his belief due to representations by the supplier that the chattels were not defective.* In all cases indemnity depends upon the existence of some form of representation made by the supplier and reasonableness, as between the two, by the payor in relying upon the supplier's representation." (Emphasis supplied.)

As justifiable reliance is the basis upon which a recovery may be had upon an implied warranty of fitness, it is also the touchstone of a claimant's right to indemnity on the ground of negligence. The only significant difference in the two theories of liability is that it is not necessary for a claimant to prove negligence in order to recover on implied warranty. But, as a claim of implied warranty will fail when it is shown that a buyer did not rely upon the seller's skill and judgment, so also will a manufacturer's claim for indemnity based upon negligence of a supplier be denied where he fails to prove justifiable reliance upon the skill and judgment of the latter.

It was American's duty to inspect the safety valves as component parts of the finished product for which it was responsible. American actively assumed that duty. It inspected every safety pilot incorporated into its heaters. It has been adjudged that it negligently failed to discover the defect in the safety valve of the Fix heater. Whether its negligence was in testing carelessly or in failing to make any test of the safety valve in the Fix heater is of no consequence. There is no basis in the evidence for a claim that a failure to make any test of the safety valve in question was because of representations by the supplier that this particular valve was not defective. See Comment under Sec. 93—Restatement, supra.

It is unnecessary to repeat the reasons already stated that negate American's claim of reliance. It is sufficient to add here that its daily experience with defective valves manufactured by Titan was a continuing caveat against such reliance. That American did not rely upon Titan is further evidenced by its constant use of its elaborate system of inspection and operational tests.

American inveighs vigorously against consideration of its failure to discover the defect in the safety valve as being active negligence. It argues that it owed no duty of inspection to Titan, and that

if it had refrained entirely from making any tests and was passively negligent in the strict sense of that term, it would be entitled beyond question to recover indemnity. The argument is without merit. In the circumstances of this case, failure on the part of American to make any tests would be such recklessness as would defeat its claim to indemnity. See Illustrations 7 and 8 under Sec. 93—Restatement on Restitution, Comment under (d). This comment reads:

"(d) Recklessness. The rule stated in this Section does not apply if the claimant was reckless in the use of the things or if he suspected that the supplier had not properly performed or if he suspected that the chattels were defective."

It would be difficult to conceive of a case where there existed a stronger reason for suspecting that "the supplier had not properly performed" or for suspecting that the chattels manufactured by the supplier were defective, than in the case at bar.

American cites and relies upon two cases where inspections were made by claimants for indemnity and recovery allowed. But these cases are readily distinguishable. In Bethlehem Shipbuilding Corp. v. Joseph Gutradt Co., 9 Cir., 10 F. 2d 769, the ship owner was held liable to the owner of cargo that had been damaged by the unseaworthiness of the vessel. The unseaworthiness was caused by the shipbuilding company's negligence in repairing clapper valves on the ship. The ship owner sued and obtained indemnity against the repairer. The evidence showed that after the work was done, an officer of the ship found that one clapper valve was uncovered and "bolted it back into place". The officer also made such inspection as was possible of the other clapper valves that were not covered by cargo and found them to be in sound condition. The shipbuilding company claimed that the vessel owner had sufficient knowledge to put it upon notice of the defective character of the work and that he was negligent in not making a more thorough inspection. In rejecting this contention the court held that the vessel owner owed no duty of inspection to the repairer and that notwithstanding its knowledge in respect of the one open valve, it had a right to assume that the shipbuilding company would properly perform its work. Thus in effect it was held that the ship owner was justified in relying upon the skill of the shipbuilding company.

In Pullman Co. v. Cincinnati, N. O. & T. P. R. Co., 147 Ky. 498, 124 S.W. 385, where indemnity was allowed the railroad company, there was an injury to one of the railroad company employees caused by defective weld in a brake staff of a car manufactured by the Pullman Company. After receiving the car the railroad inspected it twice and failed to discover the defect because it was "covered up by paint so that it could not be discovered readily." Plainly, this was a case of a latent defect.

In Pfarr v. Standard Oil Co., 165 Iowa 657, 146 N.W. 851, L.R.A.1915C, 336, the claimant failed to recover indemnity; but American relies on dictum of the court which is not inconsistent with the requirement of justifiable reliance. Upon a second trial of the Pfarr case the plaintiff was again denied a recovery.

General Accident, Fire & Life Ins. Corp. v. Goodyear Tire & Rubber Co., 2 Cir., 132 F.2d 122, was decided upon a motion for summary judgment. It was there held that in view of the affidavits filed by the plaintiff, there was a disputed matter of fact to be determined.

In none of the cited cases relied upon by the plaintiff were the parties in the relation of supplier and manufacturer, and in none of them were the facts comparable to those in the case at bar.

For the reasons stated, it is held that American has not made out a case of justifiable reliance upon the skill and judgment of Titan, and is not entitled to indemnity on the ground of negligence.

An entry may be made awarding judgment in favor of defendant.