**PIPE WELDING SUPPLY CO., Inc.,**
and
**Utica Mutual Insurance Company,
Plaintiffs,**
v.
**GAS ATMOSPHERES, INC.,**
and
**Lee Wilson Engineering Company, Inc.,
Defendants.**
No. 33696.

United States District Court
N. D. Ohio, E. D.
March 28, 1961.

James C. Davis, L. E. Oliphant, Jr., Squire, Sanders & Dempsey, Cleveland, Ohio, for plaintiffs.

Robert L. Baker, Davis & Young, Cleveland, Ohio, Rees H. Davis, Jr., Cleveland, Ohio, for defendants.

McNAMEE, District Judge.

This is a diversity case, both plaintiffs being corporate citizens of New York and both defendants corporate citizens of Ohio. Plaintiff, Pipe Welding Supply Co., Inc., whose principal place of business is in Elmira, New York, is engaged in the manufacture of carbon dioxide which it sells to industrial plants and to manufacturers and bottlers of soft drinks. Plaintiff, Utica Mutual Insurance Company, is engaged in the casualty insurance business, with its principal office at Utica, New York. Defendant, Gas Atmospheres, Inc., is engaged in the manufacture of nitrogen and carbon dioxide generators. That defendant and defendant Lee Wilson Engineering Company, Inc. (hereafter Lee Wilson, Inc.), are closely affiliated, both defendants being owned and controlled by substantially the same persons. At all relevant times herein Gas Atmospheres was operated under the management of Lee Wilson, Inc.

The gist of plaintiffs' claims, as set forth in the complaint, is that during 1952 and 1953 Gas Atmospheres made warranties to Pipe Welding that it would supply said plaintiff with a generator that would manufacture carbon dioxide

of good quality fit for the purpose for which it was to be used; that to induce Pipe Welding to purchase a carbon dioxide generator from Gas Atmospheres the defendant Lee Wilson, Inc., guaranteed the successful performance of all equipment sold by Gas Atmospheres and agreed to do everything necessary to satisfy plaintiff with said equipment. Plaintiff Pipe Welding avers that it relied upon the above warranty and guaranty of defendants and purchased a carbon dioxide generator from defendant Gas Atmospheres for the price of $49,400. Plaintiffs allege that said generator did not operate satisfactorily; that leaks occurred in the firing tube of the main boiler of said generator causing contamination of the carbon dioxide produced by said generator and purchased by customers of Pipe Welding. As a result of the contamination of the carbon dioxide, large quantities of soft drinks bottled by customers of Pipe Welding were spoiled, with the result that numerous claims for damages were made against said plaintiff. It is alleged further that the contamination of the carbon dioxide was caused by defendants' breaches of warranty, expressed or implied, and by the negligence of said defendants in designing the firing tube of the generator. Plaintiff Utica Mutual investigated and settled numerous claims against Pipe Welding and as subrogee of the latter seeks judgment against defendants in an amount equal to the total of payments made and expenses incurred in effecting said settlements. Pipe Welding seeks recovery of damages sustained by it not covered by insurance which were directly caused by defendants' breach of warranties and/or its negligence.

In their answer defendants admit the allegations of paragraph 2 of the complaint that in 1952 and 1953 Pipe Welding and Gas Atmospheres conferred frequently in relation to the sale by said defendant to Pipe Welding of a carbon dioxide generator and that said defendant made representations and warranties that its product was of good quality and

fit for the purpose for which it was to be used. Defendants also admit the allegations of paragraph 4 of the complaint that in reliance upon the representations and warranties of Gas Atmospheres and the guaranty of defendant Lee Wilson, Inc., plaintiff agreed to purchase the carbon dioxide generator for $49,400. Defendants, however, deny that any contamination of carbon dioxide was caused by breaches of warranty or by the negligence of said defendants, or either of them, in designing the firing tube of the generator. Thus the issues are whether defendants breached express warranties or an implied warranty of fitness of the generator or whether defendants were negligent in the manufacture of said generator, and whether defendants' fault, if any, in one or more of the foregoing respects was the proximate cause of the damage claimed to have been sustained by plaintiffs.

## FACTS

The salient facts, as shown by the evidence, are: For several years one of the activities engaged in by Pipe Welding was the distribution of carbon dioxide ($CO_2$), which it purchased from manufacturers. In 1952 Pipe Welding's $CO_2$ business had increased to the point where it seemed expedient for the company to manufacture its own carbon dioxide. Accordingly, early in 1952 inquiry was made by Pipe Welding of Lee Wilson, Inc. of Cleveland, Ohio, whether the latter could build a carbon dioxide generating unit with natural gas or fuel oil as the combustion material. The inquiry was answered in the affirmative by Gas Atmospheres, which was controlled by Lee Wilson, Inc. Thereafter further correspondence and personal meetings between representatives of Pipe Welding and both defendants followed. Defendants held themselves out as experienced manufacturers of generating equipment of the type in question. Under·date of May 23, 1952 Gas Atmospheres submitted to Pipe Welding a written proposal to supply a 300 pound carbon dioxide generator. A letter ac-

companying the proposal contained, inter alia, the following:

"The carbon dioxide generator is, in many respects, very similar to the Gas Atmospheres nitrogen generator and in many cases, we have provided a generator to do both, produce nitrogen and produce carbon dioxide.

\* \* \* \* \* \*

"I am sure that if you decide to furnish Gas Atmospheres equipment, you will be satisfied in every way by its appearance and performance. We are supplying quality equipment and we back up our equipment with service and our guarantee of complete satisfaction on its performance. \* \* \*"

On May 29, 1952 Pipe Welding acknowledged receipt of the proposal and requested additional information in respect of nine separate items, including the purity of the gas as manufactured, the type of purification system to be used in the generator and whether defendant could supply a unit that would operate with natural gas or fuel oil instead of natural gas only. Pipe Welding's letter concluded with the following statement:

"A great majority of our carbon dioxide business is with beverage plants for carbonating beverages and it is very important that the carbon dioxide gas produced by the unit be of the highest purity so that no off odor or off taste will be caused by the carbon dioxide gas in a beverage."

Information to the same effect was communicated orally to the Chief Engineer and Sales Manager of Gas Atmospheres who were told that the carbon dioxide must meet the purity standards of the food and drink industry and that it must be free from odor or taste. On July 31, 1952 Pipe Welding accepted defendants' proposal of the same date to produce a 300 pound per hour carbon dioxide generator made to the specifications and design of Gas Atmospheres, which included a purification system to produce carbon dioxide of 99.8% purity. The price was $40,400, and it was agreed delivery was to be made within 20 to 24 weeks.

Early in May, 1953 Williams and Loew of Pipe Welding went to Elyria, Ohio to ascertain the extent of the progress made by Gas Atmospheres in the manufacture of the generator. The situation as they found it was discouraging. Not only had Gas Amospheres failed to comply with the provisions of the contract relative to the time of delivery, but it was apparent that no delivery reasonably could be expected for a long time in the future. The officers of Pipe Welding were apprehensive that even if given additional time the defendant Gas Atmospheres would be unable to make a satisfactory generator and considered rescinding the contract. Under date of May 11, 1953, Pipe Welding received a letter from Lee Wilson, Inc., which read in part as follows:

"Lee Wilson Engineering Company, Inc. has a contract to manage Gas Atmospheres Inc. for the next five years after having operated in a similar manner on a lease arrangement for the past two and a half years.

"Both companies are principally owned by Lee Wilson or his family and the Lee Wilson Engineering Company, Inc. will guarantee successful performance of any of the equipment sold by Gas Atmospheres Inc.

"Actually you understand how the engineering from both companies is handled in the same group and you can appreciate from your visit here how close the operation of these two companies is.

"Our primary interest will be to see that you have the best operating plant that can be made for the production of $CO_2$ gas for bottling purposes and we will do everything that is necessary to have you entirely satisfied with this equipment."

After receiving the above assurances from Lee Wilson, Inc., Pipe Welding decided to afford both defendants additional time within which to produce a satisfactory generator. Later in the year 1953, while test runs of the generator were being made at defendant's plant in Elyria, Ohio, a resonance condition developed in the generator. This was attributed to sonic vibrations within the firing tube which defendant sought to eliminate by changing the design of the tube. As originally designed, the firing tube's outer surface was unconstricted and straight. The new design was of a constricted firing tube with inverted cup-like pockets around its perimeter.

Late in the fall of 1953 the parties agreed to change the size of the generator to a capacity of 400 pounds per hour instead of the 300 pounds per hour as originally specified. This required the execution of an addendum to the contract and an increase in the price of the generator to $49,400. Shortly thereafter it was agreed that because of the unavailability of adequate water and other utilities at Elyria, O., which were needed for test runs, the constituent parts of the generator should be shipped to Elmira, New York where the process of manufacture would be completed by Gas Atmospheres. Early in January 1954 the materials and equipment were installed at Pipe Welding's plant in Elmira, where Gas Atmospheres continued its efforts to produce a carbon dioxide generator that would meet its specifications. Again difficulties were encountered and changes made, and it was not until 15 months later, in March 1955, that the test runs proved reasonably satisfactory. About the middle of March 1955 the generator was turned over to Pipe Welding.

On June 16, 1955, three months after Pipe Welding assumed the operation of the generator, a leak developed in the constricted area of the firing tube. On discovery of the leak operation of the generator was discontinued. Pipe Welding then reported the failure by telephone to Mr. Boyd, Sales Manager of Gas Atmospheres, and inquired whether the tube could be repaired. Williams and Loew, of Pipe Welding, both talked to Boyd, who told them that the repairs could and should be made, and instructed them in the manner of making them. In this telephone conversation it was suggested that probably the leak occurred because the cooling monoethanolamine (hereafter amine) could not flow into the corners of the pockets in the constricted area of the tube. During this telephone conversation also inquiry was made of Boyd whether the leaking of the amine into the firing tube would have any contaminating effect upon the carbon dioxide. After a pause, during which he apparently consulted with others at Gas Atmospheres, Boyd replied that "there would be no problem along those lines." At this time Gas Atmospheres also agreed to supply to Pipe Welding, without charge, a new firing tube of straight unconstricted design. After repairing the tube Pipe Welding resumed operation of the generator, which functioned without incident until the morning of August 24, 1955, when it suddenly ceased to operate. Investigation disclosed that a leak approximately one-eighth inch in diameter had caused the firing tube to become partially filled with amine, which quenched the flame of the burner. Immediately upon discovery of the above condition Pipe Welding notified Gas Atmospheres, whose General Manager, Samuel Garee, flew to Elmira and supervised the repair of the tube, which entailed working through the night into the next day.

In October 1955 a new firing tube of straight unconstricted design was delivered. About a week after the failure of the firing tube, on August 24, 1955, Pipe Welding received from its customers a veritable deluge of complaints about the bad odor and taste of the $CO_2$ in their carbonated beverages. At the outset Pipe Welding assumed that the conditions complained of were in no way related to the $CO_2$ sold to its customers. However, facts developed which indicated the probability that Pipe Welding's

$CO_2$ might well be the cause of the widespread spoilage of carbonated beverages bottled by plaintiff's customers. The matter was referred to plaintiff's insurance carrier, Utica Mutual Insurance Company, who investigated the numerous claims of the bottlers and engaged the services of Dr. Herbert Wiegand, a highly qualified chemical engineer from Cornell University, to investigate and determine the cause of the contamination of the carbon dioxide. Dr. Wiegand's investigation was thorough, encompassing, inter alia, a careful examination of the equipment of Pipe Welding and of samples of the contents of filters at plants of the bottlers. It was Dr. Wiegand's opinion that Pipe Welding's $CO_2$ was contaminated as a result of the leakage of amine into the combustion chamber, which was caused solely by the improper design of the firing tube.

Utica Mutual settled many of the claims and each settlement was preceded by a careful and thorough investigation in which Utica Mutual was assisted by employees of Pipe Welding. The facts developed by the investigation indicated Pipe Welding's liability to its customers for the damage resulting from the contaminated carbon dioxide, and it was the considered opinion of the legal department of Utica Mutual that it was obligated to pay the claims against Pipe Welding. Before each settlement, Gas Atmospheres was notified of its terms and informed that Utica Mutual would withhold consummation of the settlement for eight days to enable Gas Atmospheres, or its insurance carrier, to handle the settlement or to make objections thereto. All such notices were acknowledged by Gas Atmospheres, who forwarded them to its insurance carrier, but no objections were made by either Gas Atmospheres or its carrier to any of the settlements as proposed by Utica Mutual. The amount paid by Utica Mutual in settlement, including its expenses, amounts to $30,117.47. Dr. Wiegand's opinion that the sole cause of the contamination of the carbon dioxide was

the improper design of the firing tube was corroborated by Mr. Howard Sommers, an expert of wide experience in the manufacture and distribution of $CO_2$. Charles Vana, an expert called by defendant, admitted that the cause of the failure of the firing tube was improper design. Even Mr. Boyd, who is now president of Gas Atmospheres, admitted that in July, 1956, he reported—

"It was the failure (the August 1955 leak in the firing tube) which resulted in the claimant distributing $CO_2$ which was apparently contaminated and further resulted in the large number of claims from beverage plants receiving this $CO_2$."

Pipe Welding purchased from other manufacturers a small portion of the $CO_2$ it distributed to its customers. However, the possibility that the purchased $CO_2$ was the offending agent was effectively ruled out by credible evidence offered by plaintiffs. Further facts will appear in the discussion of the issues.

## DISCUSSION

### The Law of New York Governs

The Ohio courts have held that the validity of a contract is to be determined by the law of the place where the contract was to be performed. Pittsburgh, C. C. & St. L. R. R. Co. v. Sheppard, 56 Ohio St. 68, 46 N.E. 61; Kanaga v. Taylor, 7 Ohio St. 134; Montana Coal & Coke Co. v. Cincinnati Coal & Coke Co., 69 Ohio St. 351, 69 N.E. 613; 9 Ohio Jur.2d, Conflict of Laws, § 63. Another test has been applied in Ohio. In Brocalsa Chemical Co. v. Langenskamp, 32 F.2d 725, 729 (6th Cir.), it was held that—

"The validity of a contract is determined by the law of that state where occurred the last act necessary to make the contract complete."

See also 9 Ohio Jur.2d, Conflict of Laws, § 62.

Under either of the above tests, the law of New York governs as to plaintiff's claim for breach of warranty. The issue of negligence is also governed by

the law of New York. As stated in 9 Ohio Jur.2d, at 719:

> "The Restatement selects the law of the state where the last event necessary to make the actor liable for the alleged tort took place. This is in accord with the weight of authority in this country and probably expresses the Ohio view."

See Smith v. Smith, Ohio Com.Pl., 89 N.E.2d 588.

### Is defendant Gas Atmopsheres Liable for Breach of Warranty?

 The contract between Pipe Welding and Gas Atmospheres contained an express warranty obligating the latter to "make good" any default due to defective material or workmanship which might develop prior to 90 days of actual service but within one year after the completion date of the erection of the generator. Pipe Welding, however, does not rely upon the above warranty. It is plaintiff's claim that the statement of Gas Atmospheres in its letter of May 23, 1952 that "We are supplying quality equipment and we back up our equipment with service and our guarantee of complete satisfaction in its performance" constitutes the express warranty that was breached. An essential element of an express warranty is an affirmation or promise "relating to the goods"—i. e., the goods that are the subject of the sale. The contract of July 31, 1952 related to a generator to be constructed for the special purpose of producing carbon dioxide of highest purity, including as a part of its equipment a purification system. That generator was also designed to operate on either natural gas or fuel oil and in other respects was an improvement upon and different from the generator described in the initial proposal of May 23, 1952. Under such circumstances, the question

arises whether the affirmation and implied promise in the letter that accompanied the initial proposal can be carried over and related to the generator as described in the contract of July 31, 1952. Even if this question were decided adversely to Pipe Welding, there would be available to the latter a right of action for breach of implied warranty.[1] Pipe Welding expressly made known to Gas Atmospheres the particular purpose for which the generator was required and relied on the seller's skill and judgment Thus there was an implied warranty that the generator was fit for the purpose of producing $CO_2$ gas of highest purity and free from odor or taste when used in bottled soft drinks. Defendant advances several arguments directed to showing in the alternative that there was no implied warranty or that no breach of such warranty occurred. Defendant's contentions that plaintiff did not rely upon Gas Atmospheres' skill and judgment; that plaintiff made an examination of the generator that ought to have disclosed the improper design of the firing tube; and that plaintiff participated in the design of the tube are not sustained by the requisite degree of proof. It is true that plaintiff was extremely tolerant of the many and frequent delays encountered in the progress of the work and, to the extent of its ability to do so, cooperated in the efforts being made by defendants to produce a satisfactory generator but by reason of its lack of knowledge and experience in the manufacture of generators Pipe Welding was compelled to and did rely upon defendants' knowledge and skill. At no time did Pipe Welding examine or have the opportunity to examine the design of the firing tube which was located within the main boiler. The change in the design of the tube was made without Pipe Welding's knowledge or participation. Williams, of Pipe

---

[1]. Section 96, subd. 1, McKinney's Consol. Laws, Personal Property Law of New York reads: "Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he is the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose."

Welding, from time to time tested the purity of the $CO_2$ by smell and taste. It was shown, however, that such tests were unreliable and that no bad odor or taste was discovered as a result of these irregular periodic tests. This situation is readily distinguishable from American Radiator & Standard Sanitary Co. v. Titan Valve Mfg. Co., 144 F.Supp. 841 (E.D.Ohio), aff'd. 246 F.2d 947 (6th Cir.), where regular efficient tests and careful inspections capable of demonstrating defects in the devices in question were made and relied on by plaintiff in that case. A further review of the evidence and contentions of defendant in relation to implied warranty would be futile. It is enough to say that the evidence discloses a breach of implied warranty resulting from the improper design of the firing tube but, for reasons presently to be stated, I hold that Pipe Welding cannot recover consequential damages from Gas Atmospheres on the ground of a breach of either express or implied warranty.

The following clause appears in the contract between Pipe Welding and Gas Atmospheres:

"Gas Atmospheres, Inc. assumes no liability for consequential damages of any kind which result from the use or misuse of the equipment, supplied hereunder, by the Purchaser, his employees or others."

 It is defendants' claim that under the above quoted provision of the contract consequential damages are not recoverable for breach of warranty. Defendants did not plead the above exculpatory clause as a defense in avoidance of liability as required by Rule 8(c) F.R.Civ.P., 28 U.S.C.A. Plaintiff contends that by reason of such failure defendants must be deemed to have waived such defense. This argument takes no account of Rule 15(c) which authorizes a court to permit amendments to the pleadings even after judgment whenever such action would subserve the ends of justice. The situation here presented calls for the invocation of the liberal provisions of the last mentioned rule. Plaintiff advances the argument that the above quoted exculpatory clause "does not apply to the use of the generator supplied by Gas Atmospheres but relates only to the equipment supplied by the purchaser." This argument is untenable. It cannot be supposed in reason that a manufacturer of a generator would seek immunity from consequential damages arising from breach of express or implied warranty of the fitness of his product by a meaningless disclaimer of liability from consequential damages resulting from the use or misuse of equipment supplied by others. As is not infrequently the case, the arrangement of words in the exculpatory clause is somewhat awkward, but upon a careful reading its meaning becomes clear. A clause in a contract must be interpreted in the light of its subject matter and the intention of the parties. Where the language is susceptible of two constructions "one of which makes it fair, customary and such as prudent men would voluntarily execute, while the other makes it inequitable, unusual or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred." 12 Am.Jur., § 250, p. 792.

Applying the foregoing rules, the clause in question must be read as a disclaimed by Gas Atmospheres of consequential damages resulting from the use or misuse "by the purchaser, his employees or others" of the equipment supplied by said defendant. Plaintiff's further argument that the words "assume no liability" as used in the exculpatory clause do not mean "shall not be liable" is not persuasive. One of the issues in Despatch Oven Co. v. Rauenhorst et al., 229 Minn. 436, 40 N.W.2d 73, involved the meaning of a clause involving language identical with the clause here in question. It was argued in the cited case that under the circumstances the words "assumes no liability" could not be equated with the phrase "shall not be liable." In rejecting the

argument, the Supreme Court of Minnesota said:

"To begin with, the word 'assume' etymologically means to take upon one's self, and when used in law with respect to a liability, as, for example, to *assume* a liability, it means to become personally liable therefor by paying or otherwise discharging it. Kirk v. Welch, 212 Minn. 300, 3 N.W.2d 426; Springer v. DeWolf, 194 Ill. 218, 62 N.E. 542, 56 L.R.A. 465, 88 Am.St.Rep. 155; Texas Employers' Ins. Assn. v. Texas & P. Ry. Co., Tex.Civ.App., 129 S.W.2d 746; Lenz v. C. & N. W. Ry., 111 Wis. 198, 86 N.W. 607. The use of the negative—assumes *no* liability—is indicative of an intention that the party shall *not* become liable." (p. 443, 40 N.W.2d 78.)

The Minnesota court held that the clause was effective to exempt the seller from liability for consequential damages for breach of warranty.

██ A clause in a contract of sale limiting or excluding the seller's liability for damages is not contrary to public policy. Indeed such provision is authorized by Section 71 of the Uniform Sales Act, § 152, New York Personal Property Law, which reads:

"Where any right, duty, or liability would arise under a contract to sell or a sale by implication of law, it may be negatived, or varied by express agreement, by the course of dealing between the parties, or by custom, if the custom is such as to bind both parties to the contract or the sale."

The above section was applied in Alaska Pacific Salmon Co. v. Reynolds Metal Co., 2 Cir., 163 F.2d 643, 656, where the court applying New York law said, inter alia:

"Pursuant to that section, businessmen are at liberty to contract away rights and obligations which would arise under such an implied warranty."

In Associated Spinners v. Massachusetts Textile Co., 75 N.Y.S.2d 263 (Sup. Ct., it was held that:

"A limitation on the damages recoverable by a buyer on a breach of warranty may be expressly provided for in a contract." (Citing Lee v. Industrial Laundry Machine Co., 261 App.Div. 741, 27 N.Y.S.2d 202; Plimpton v. Brown Bros., 224 N.Y. 724, 121 N.E. 886.)

See also Broderick Haulage, Inc. v. Mack-International Motor Truck Corp., 1 A.D.2d 649, 153 N.Y.S.2d 127, 2 N.Y.2d 1011, 163 N.Y.S.2d 619; Freemantle v. U. S. Hoffman Machinery Co., 2 A.D.2d 634, 151 N.Y.S.2d 856. Cases from other jurisdictions upholding the provisions in a contract exempting the seller from liability for consequential damages are Monarch Brewing Co. v. George J. Meyer Mfg. Co., 9 Cir., 130 F. 2d 582; Martin v. Southern Engine & Pump Co., 130 S.W. 1065 (Tex.Civ. App); Wallach Ice Machine Co. v. Hanewald, 275 Mich. 607, 267 N.W. 748; Boylston Housing Co. v. O'Toole, 321 Mass. 538, 74 N.E.2d 288, 172 A.L.R. 1251.

██ For the reasons indicated above, I hold that the exculpatory clause of the contract is effective to release Gas Atmospheres from liability for consequential damages resulting from a breach of warranty express or implied. Under the law of New York, however, the exculpatory clause is not effective as an exemption of liability for negligence. It is the law of that state that a party cannot limit or exclude liability for negligence except by contractual language of unquestionable clarity that expressly so provides. In Howard v. Handler et al., 279 App.Div. 72, 107 N.Y.S.2d 749, aff'd. without opinion 303 N.Y. 990, 106 N.E.2d 67, the court said:

"We will not extend our consideration of the case beyond the question of whether defendant succeeded by its draftsmanship in effecting the exculpation which it claims. The law does not look with favor upon attempts to avoid liability for

one's own fault, and although it is permissible in instances to contract oneself out of liability for negligence, such a result is not to be countenanced unless it is absolutely clear that such was the understanding. It must be precisely provided that limitation of liability extends to negligence or other fault of the party attempting to shed his ordinary responsibility." (107 N.Y.S. 2d p. 752.)

To the same effect is Boll v. Sharp & Dohme, Inc., 281 App.Div. 568, 121 N.Y. S.2d 20; Montano v. Sringfield Gardens National Bank, 207 Misc. 840, 140 N.Y. S.2d 63; Galante v. Hathaway Bakeries, Inc., 6 A.D.2d 142, 176 N.Y.S.2d 87. The exculpatory clause of the contract does not relieve the defendant Gas Atmospheres from liability for its negligence, if any. Lee Wilson Engineering Co., Inc. was not a party to the contract. Consequently the exculpatory clause has no application to the liability of that defendant either for breach of warranty or for negligence.

## NEGLIGENCE

■■■ A duty to exercise care may arise through an express or implied contract. As stated in 38 Am.Jur., § 20, p. 662:

"Accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract. In such a case, the contract is mere inducement creating the state of things which furnishes the occasion of the tort. In other words, the contract creates the relation out of which grows the duty to use care."

■■■ Gas Atmospheres owed Pipe Welding the duty to exercise reasonable care and skill in the manufacture of the generator. Both Lee Wilson, Inc. and Gas Atmospheres were owned and controlled by Lee Wilson or his family.

Both corporations operated under the same management and were united in interest in supplying Pipe Welding with a satisfactory $CO_2$ generator.

Lee Wilson, Inc. was not a party to the written contract but, acting in its own interest and in behalf of Gas Atmospheres, it assumed the obligation of producing for Pipe Welding a generator that would be fit for the purpose for which it was to be used. By virtue of the written inducements in Lee Wilson's letter of May 11, 1953, upon which Pipe Welding relied, there was created a relation between that defendant and Pipe Welding that required the former to exercise reasonable care and skill in manufacturing or supervising the manufacture of the generator. Thus both defendants owed to Pipe Welding the duty of reasonable care and skill. Liability for negligence may co-exist with a buyer's cause of action for breach of warranty or it may exist independently of the latter. Prosser on Torts, 2d Ed., § 83, pp. 491–493. A person who undertakes to manufacture an instrumentality for use by others will be held to an expert's knowledge of the arts, materials and processes relating to his product. Harper & James, Law of Torts, § 284, p. 1541. The evidence clearly establishes that defendants breached their duty to exercise reasonable care and skill in designing the firing tube of the main boiler. Both Dr. Wiegand and Mr. Sommers testified that the adoption of the constricted design of the firing tube was the poorest possible approach to the resonance problem. It was also the uncontradicted testimony of these experts that it should have been apparent to anyone engaged in designing a carbon dioxide generator that the restriction of the free flow of amine inevitably would cause premature failure of the firing tube. No other generator manufactured by Gas Atmospheres either before or after the generator in question was equipped with a firing tube of constricted design. There is nothing in the experience of the defendants as manufacturers of generators nor does the evidence indicate anything in the

experience of such manufacturers generally that tends to justify the constricted design of the firing tube. Plaintiff aptly characterized such design as "an ill-advised experimentation." Defendants' expert was in agreement with the testimony of the experts of plaintiff that the cause of the failure of the firing tube was its improper design. A fair evaluation of the evidence compels the conclusion that a manufacturer of a $CO_2$ generator, of the skill defendants held themselves out as possessing, who exercised reasonable care, would not have constructed a firing tube of constricted design for use in a generator producing carbon dioxide for carbonated beverages. Compare: Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 183 F.2d 467, at 470.

Although defendants did not plead the affirmative defenses of contributory negligence and assumption of risk, they argue that such defenses are made out by the evidence. The defense of assumption of risk merits but brief comment. There is a complete absence of any evidence tending to show that Pipe Welding had knowledge of any risk whatever in the operation of the generator. Without such evidence, the defense of assumption of risk falls of its own weight. 38 Am.Jur., § 173, p. 847. The defendants imply that from June 16 to August 24, 1955, Pipe Welding was negligent in operating the generator at a rate of production greatly in excess of the standard rated capacity of 400 pounds per hour. There were some occasions during the above period when the rate of production exceeded 440 pounds per hour. However, for the greater part of the period the rate of production was only slightly in excess of 400 pounds per hour. There is evidence that at times between March and June, 1955, the generator was operated by plaintiff at more than 440 pounds per hour. But, during the 36 hour test conducted by Gas Atmospheres on March 1st and 2nd, 1955, the production was as high as 430 to 475 pounds per hour. At no time was Pipe Welding informed that a rate of production in excess of 400 pounds would result in injury to any part of the generator. The testimony of Sommers repels the notion that production in excess of the standard rated capacity of the generator contributed to cause the failure of the firing tube. Furthermore, since 1956, when the straight firing tube was installed, the generator had been operated continuously without any leaks occurring although its production has frequently exceeded the newly rated capacity of 600 pounds per hour. Defendant also contends that the failure of Pipe Welding to properly maintain the cleansing devices of the generator, such as the permanganate towers, contributed in some way to the production of contaminated carbon dioxide. However, the evidence upon which defendants rely in support of that claim is effectively overcome by plaintiff's evidence that the inspection of and changes in the permanganate towers were made more frequently than required by the oral and written instructions received from Gas Atmospheres. It should be noted also that both Dr. Wiegand and Mr. Sommers testified that while the purification system of the generator was designed to remove impurities normally encountered, it could not be expected to remove the many fragmentary impure chemical compounds created by the entrance of amine into the flue mixture. Defendant contends further that after the first leak in June, 1955, Pipe Welding negligently failed to maintain a lookout for leaks in the firing tube. It is to be remembered, however, that in June, 1955, in direct response to plaintiff's inquiry whether the leaking of amine into the combustion chamber would affect the purity of the carbon dioxide, Gas Atmospheres assured plaintiff that "there would be no problem along those lines." Plaintiff was justified in relying upon the assurance thus given by defendant. The evidence does not sustain the defense of contributory negligence. To supplement its own production in 1955 plaintiff purchased comparatively small quantities

of carbon dioxide from other manufacturers. Purchases were made from The Olin Mathison Chemical Company in May, June, July and September of 1955 and from Wyandotte Chemical Company in August and September of that year. The quantity of such purchased $CO_2$ was but a very small percentage of the total amount distributed by Pipe Welding and represented a much smaller portion of the total amount of $CO_2$ distributed by the two manufacturers mentioned above. A representative from each of the above companies testified positively that during the entire year 1955 neither company received any complaints in respect to the quality of the carbon dioxide delivered by it during that year. The obvious inference to be drawn from such testimony is that the $CO_2$ distributed by such companies was pure. It is a fair conclusion, therefore, that if the large amount of $CO_2$ distributed by the two companies to its other customers was uncontaminated, the small amount of $CO_2$ received by Pipe Welding from the same sources also was free of impurities.

Defendants contend that plaintiffs failed to exclude other possible causes of the contamination. But there is no evidence to support the view that the contamination was attributable to any cause except the negligence of defendants.

I hold that defendants' negligent design of the firing tube was the sole cause of the contamination of the $CO_2$ manufactured and supplied by Pipe Welding and the resultant damage to plaintiffs.

In view of the above holding it is unnecessary to determine whether Lee Wilson, Inc. is liable for breach of warranty.

## DAMAGES

Damages for negligence "may be recovered against tortfeasors for all the natural, direct and proximate consequences of the wrongful act or omission." 15 Am.Jur. § 66, p. 471. This is the rule in New York. Steitz v. Gifford, 280 N.Y. 15, 19 N.E.2d 661, 122 A.L.R. 292. As indicated by the statement of facts, each separate complaint

of Pipe Welding's customers was investigated thoroughly by Utica Mutual and representatives of Pipe Welding. Abundant evidence supports the causal relation between the damage sustained by each of the claimants and the negligence of the defendants. Before each settlement was made defendant Gas Atmospheres and its insurance carrier were notified and afforded ample opportunity to object to the proposed settlement or to handle the claims. There can be no doubt of Pipe Welding's liability to its customers or of Utica Mutual's obligation to save Pipe Welding harmless. No question is raised as to Utica Mutual's right of subrogation. The fact that the claims were settled instead of being reduced to judgments is no barrier to plaintiffs' right of recovery. Travelers Ins. Co. v. Great Lakes Engineering Works Co., 184 F. 426, 36 L.R.A.,N.S., 60 (6th Cir.); Frank Martz Coach Co. v. Hudson Gas Transportation Co., 23 N.J.Misc. 342, 44 A.2d 488; Globe Indemnity Co. v. Schmidt, 142 Ohio St. 595, 53 N.E.2d 790. The payments made and expenses incurred by Utica Mutual in connection with the settlement of claims against its insured amount to $30,117.47, for which amount plaintiff Utica Mutual is entitled to judgment against the defendants. Damages sustained by Pipe Welding not covered by insurance are:

| | |
|---|---|
| Loss of 122,202 pounds carbon dioxide | $ 3,177.25 |
| Cleaning high and low pressure systems at customers' plants | $ 1,367.92 |
| Services of employees in re investigating claims | $ 3,460.13 |
| Traveling and L. D. telephone calls in re investigation | $ 1,574.09 |
| New filters, etc. for customers | $ 5,068.57 |
| Cost of repairing tube in June and August, 1955 and installing new tube in October 1955 | $ 1,825.00 |
| | $16,472.96 |

Pipe Welding is entitled to judgment against both defendants in the above amount.

Judgment may be entered in favor of each plaintiff against both defendants in the amounts stated above.

The foregoing Memorandum constitutes Findings of Fact and Conclusions of Law pursuant to Rule 52(a).