**BERWIND CORPORATION, a Pennsylvania Corporation, Plaintiff-Appellant,**

v.

**LITTON INDUSTRIES, INC., a Delaware Corporation, Defendant-Appellee.**

Nos. 75–1134, 75–1135.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1975.

Decided Feb. 26, 1976.

Rehearing and Rehearing En Banc Denied April 2, 1976.

Robert A. Downing, Chicago, Ill., for Berwind.

Leo K. Wykell, Chicago, Ill., for Litton Industries.

Before CASTLE, Senior Circuit Judge, SPRECHER, Circuit Judge, and CAMPBELL, Senior District Judge.*

SPRECHER, Circuit Judge.

The major issue in this diversity case is whether an exculpatory clause in a commercial contract clearly, explicitly and unequivocally (as required by Illinois law) limited negligence damages.

I

This action arose out of the purchase by the Komarek-Greaves Division of Berwind Corporation of 16 speed reducers from the Hewitt-Robbins Division of Litton Industries, Inc., for use by the buyer in its compactors manufactured and sold for use in the potash industry.

In August, 1968, the buyer requested the seller to review the design of its previously used speed reducers. After an inspection of one of buyer's installations by one of the seller's field engineers, the seller proposed design changes in a letter to the buyer dated September 9, 1968. On October 14, 1968, the seller submitted a proposal to manufacture 16 speed reducers for buyer in

---

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

accordance with the design recommended by seller in its September 9 letter at $14,850 each. On October 15, the buyer accepted the offer by means of a purchase order.

The speed reducers designed and manufactured by the seller failed to operate the compactors properly. The buyer was compelled, after attempts to remedy the seller's reducers, to furnish its customers new reducers manufactured by another party.

On July 9, 1971, the buyer filed its complaint alleging negligence (Count I), breach of contract (Count II), breach of warranty for intended use (Count III) and misrepresentation or fraud in the inducement (Count IV). Count III was dismissed by the court on January 14, 1972. The court separated the issues of liability and damages for trial. Liability was tried before a jury and at the close of the buyer's case, the court directed a verdict in favor of the seller on Count IV on July 24, 1973. Consequently, the case was submitted to the jury on amended Counts I (negligence) and II (breach of contract) and upon the seller's amended counterclaim for the balance of the purchase price.

On July 30, 1973, the jury returned three verdicts, finding for the buyer on negligence and for the seller on breach of contract and on the counterclaim.

Both sides waived a jury trial on the issues of damages and all damage issues were tried before the court upon a second trial. On May 24, 1974, the court made preliminary findings and conclusions as to damages and in a judgment order of July 30, 1974, entered final findings and conclusions. The judgment entered was in the amount of $25,672.70 plus costs for the buyer on Count I and in the amount of $82,-662.50 plus costs for the seller on its counterclaim. Both parties have appealed but on appeal have only challenged the damages awarded. Consequently, we are circumscribed in our consideration of the case by the three jury verdicts finding that the seller is guilty of negligence but not guilty of any breach of contract and that the buyer is liable on the counterclaim for the balance of the purchase price. Subject to the "clearly erroneous" rule, we are also circumscribed by the trial court's findings of fact on the damage issues.

## II

On the reverse side of the seller's quotation of October 14, 1968 was a printed form containing ten contractual provisions, each being numbered and beginning with a descriptive heading. Included under provision numbered "5." and headed "Warranty" was the following:

Our liability under this contract is limited to the purchase price of the defective item and in no event are we to be liable for any loss of profits or special or consequential damages.

Also under the same number and heading were five paragraphs preceding the above paragraph, each of which dealt in some detail with the express warranties made by the seller.

Prior to the jury trial, the court determined that the above paragraph was part of the written contract between the parties and that it did "not necessarily eliminate the claim for negligence but related directly to the measure of damages." The jury was not asked to determine the effect of this clause.

After the jury verdict, the court rendered a "Decision on Damages" on December 3, 1973, in which it concluded that "the foregoing clause does not absolve the defendant from liability from its own negligence" but "the clause . . . protects the defendant from liability (and therefore from damages) for (1) loss of profits, (2) special damages, and (3) consequential damages." The court then proceeded, after hearing evidence at a bench trial, to fix damages in accordance with his theory that the three limitations on the seller's liability applied even though the jury had found against the seller on the negligence count. In other words, the court concluded that the exculpatory clause applied to negligence as well as to breach of warranty.

Federal jurisdiction was based on diversity of citizenship,[1] but the contract was made and performed in Illinois and both parties have proceeded on the basis that the law of Illinois governs.

Illinois some time ago recognized that "under proper circumstances" a person may by contract avoid liability for his negligence and that exculpatory contracts will be enforced unless "(1) it would be against the settled public policy of the State to do so, or (2) there is something in the social relationship of the parties militating against upholding the agreement."[2]

Under Illinois law three prerequisites must be met before an exculpatory clause[3] will be deemed to defeat a claim:

(1) The exculpatory clause must be strictly construed;[4]

(2) With every intendment against the party who seeks immunity from liability;[5] and

(3) The clause must spell out the intention of the parties with the greatest of particularity.[6]

Exculpatory contracts or clauses are also subject to the general contract rule that they are construed most strongly against their maker,[7] "and especially so when printed upon the [maker's] form."[8]

Despite these strict rules of construction, however, a specific reference to "negligence" or its cognates is not required.[9]

Finally, the Illinois Supreme Court recently concluded in interpreting an indemnification provision:[10]

We . . . conclude that the contractual provisions involved [in the cases] are so varied that each must stand on its own language and little is to be gained by an attempt to analyze, distinguish or reconcile the decisions. The only guidance afforded is found in the accepted rule of interpretation which requires that the agreement be given a fair and reasonable

1. The amended complaint alleged that the plaintiff, Berwind Corporation, was a Pennsylvania corporation with its principal place of business in Pennsylvania and that defendant, Litton Industries, Inc., was a Delaware corporation with its principal place of business in California. Defendant's answer admitted the jurisdictional allegations.

2. *Jackson v. First Nat. Bank,* 415 Ill. 453, 460, 114 N.E.2d 721, 725 (1953).

3. Illinois applies the same principles of law to an exculpatory agreement and to an indemnification contract. *Hulse v. Midwest Emery Freight System, Inc.,* 12 Ill.App.3d 316, 318, 299 N.E.2d 24, 25 (1973).

4. *Jackson v. First Nat. Bank,* 415 Ill. 453, 463, 114 N.E.2d 721, 726 (1953) ("always to be strictly construed against the party in whose favor they operate"); *Valentin v. D. G. Swanson & Co.,* 25 Ill.App.2d 285, 290, 167 N.E.2d 14, 17 (1960); *Moss v. Hunding,* 27 Ill.App.2d 189, 193, 169 N.E.2d 396, 399 (1960); *Book Production Industries, Inc. v. Blue Star Auto Stores, Inc.,* 33 Ill.App.2d 22, 32, 178 N.E.2d 881, 886 (1961); *Koehler v. Southmoor Bank & Trust Co.,* 40 Ill.App.2d 195, 199, 189 N.E.2d 22, 24 (1963); *Owen v. Vic Tanny's Enterprises,* 48 Ill.App.2d 344, 346, 199 N.E.2d 280, 281 (1964); *Hulse v. Midwest Emery Freight System, Inc., supra.*

5. *Jackson v. First Nat. Bank, supra; Valentin v. D. G. Swanson & Co., supra; Owen v. Vic Tanny's Enterprises, supra.*

6. *Westinghouse Electric Elevator Co. v. LaSalle Monroe Bldg. Corp.,* 395 Ill. 429, 433, 70 N.E.2d 604, 607 (1946) ("clear and explicit language . . . or such intention is expressed in unequivocal terms"); *Tatar v. Maxon Construction Co.,* 54 Ill.2d 64, 67, 294 N.E.2d 272, 273 (1973); *Zadak v. Cannon,* 59 Ill.2d 118, 120, 319 N.E.2d 469, 471 (1974); *Moss v. Hunding, supra; Koehler v. Southmoor Bank & Trust Co., supra.*

7. *Halperin v. Darling & Co.,* 80 Ill.App.2d 353, 357, 225 N.E.2d 92, 94 (1967).

8. *Gay v. S. N. Nielsen Co.,* 18 Ill.App.2d 368, 376, 152 N.E.2d 468, 472 (1958). *See also, Overland Bond & Investment Corp. v. Howard,* 9 Ill.App.3d 348, 356–57, 292 N.E.2d 168, 174 (1972).

9. *Spurr v. LaSalle Construction Co.,* 385 F.2d 322, 330 (7th Cir. 1967); *Granite City Steel Co. v. Koppers Co., Inc.,* 419 F.2d 1289, 1290 (7th Cir. 1969); *Gates Rubber Co. v. USM Corp.,* 508 F.2d 603, 616 (7th Cir. 1975).

10. *Tatar v. Maxon Construction Co.,* 54 Ill.2d 64, 67, 294 N.E.2d 272, 273–274 (1973).

interpretation based upon a consideration of all of its language and provisions.

A comment to the Restatement of Torts Second section recognizing the validity of express assumptions of risk,[11] states:

In order for the agreement to assume the risk to be effective, it must also appear that its terms were intended by both parties to apply to the particular conduct of the defendant which has caused the harm. Again, where the agreement is drawn by the defendant and the plaintiff passively accepts it, its terms will ordinarily be construed strictly against the defendant. In particular, general clauses exempting the defendant from all liability for loss or damage will not be construed to include loss or damage resulting from his intentional, negligent or reckless misconduct, unless the circumstances clearly indicate that such was the plaintiff's understanding and intention.[12]

With these principles of Illinois and general law in mind, we proceed to examine several cases where although the language of exculpation differed from case to case, the basic issue being resolved was substantially the same as the issue confronting us here.

The only highly relevant case involving Illinois law is *Gates Rubber Co. v. USM Corp.*, 508 F.2d 603 (7th Cir. 1975), involving a claim for damages resulting from the failure of a lead extrusion press wherein negligence in the design, manufacture and installation of the press was alleged. Paragraph 7 of the contract provided:

We shall have no liability for any special indirect or consequential damages arising from loss of production or other losses owing to failure of machinery or equipment. (508 F.2d at 616.)

Mr. Justice (then Judge) Stevens concluded at 617:

Paragraph 7 of the USM proposal referred broadly to consequential damages "owing to failure of machinery or equipment." In paragraph 5 of the proposal, USM had specifically limited its liability and remedies for breach of warranty. Paragraph 7 would be superfluous, therefore, if it were read as merely referring to warranty recovery. The most logical interpretation of paragraph 7 is that USM was limiting its liability for consequential damages that might be sought in suits based on theories other than breach of warranty. We hold, therefore, that Gates was properly apprised of the fact that the USM proposal contained a limitation of consequential damage liability that would apply in any subsequent negligence action.

The keystone of *Gates*—the superfluity of paragraph 7 if construed to exclude a limitation on negligence liability—does not apply to the present case. In fact, instead of containing a separate breach-of-warranty exculpation, the present contract includes the purportedly general language of exculpation as part of the warranty section. *Gates* thus supports an interpretation of the present provision which would exclude negligence from its operation.

In developing the rules of construction applicable to exculpatory-indemnity clauses, the Illinois Supreme Court relied heavily on New York and Pennsylvania law.[13]

In *Pipe Welding Supply Co., Inc. v. Gas Atmospheres, Inc.*, 201 F.Supp. 191 (N.D. Ohio 1961), the claim resulted from the sale of defective generators. The exculpatory clause read:

Gas Atmospheres, Inc. assumes no liability for consequential damages of any kind which result from the use or misuse of the equipment, supplied hereunder, by

11. Restatement, Second, Torts, § 496B reads: "A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy."

12. Comment d, Restatement, Second, Torts, § 496B.

13. *Westinghouse Electric Elevator Co. v. LaSalle Monroe Bldg. Corp.*, 395 Ill. 429, 433–34, 70 N.E.2d 604, 607 (1946).

the Purchaser, his employees or others. (201 F.Supp. at 198.)

Applying New York law, the court held that the language did not preclude full liability for negligence inasmuch as liability exclusions must be "by contractual language of unquestionable clarity." 201 F.2d at 199.

Similarly, in *Becker Pretzel Bakeries, Inc. v. Universal Oven Co.*, 279 F.Supp. 893, 896, 900 (D.Md.1968), applying New York law to a claim based on a fire in a defective pretzel oven, the court held the words "in no event shall any claims for consequential damages be made" in a breach of warranty section did not express in unequivocal terms an intention to preclude or limit liability for negligence.

In *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205 (3d Cir. 1970), applying Pennsylvania law to a claim based on the sale of odoriferous unsaturated oils, the court of appeals held that the provision "Buyer assumes all risk and liability for the results obtained by the use of any material delivered" did not "clearly and unequivocally spell out the intent to grant such immunity . . . from liability" for negligent conduct. 422 F.2d at 1217. The court added at 1219:

> If there is any doubt as to the meaning of an exculpatory clause, the party seeking its protection cannot be said to have carried his burden.[14]

In *Boone Valley Cooperative Processing Ass'n v. French Oil Mill Machinery Co.*, 383 F.Supp. 606 (N.D.Iowa 1974), applying Iowa law to a claim against the installer of soybean processing equipment for an explosion at the plant, the court interpreted the following provision:

The seller shall not be held liable under this contract for any special, ordered, or consequential damages whatsoever.

The court concluded that this language limited tort claims based on contractual duties but did not limit negligence claims based on an independent duty. 383 F.Supp. at 614.

In the present case the jury found the seller liable for negligence but not liable for breach of contract. Hence the negligence liability was based upon independent duties and not upon contractual duties. Under the *Boone Valley* analysis, the limitation provision in the present contract would not apply to the buyer's negligence claims.

In *Bahamas Agricultural Industries Limited v. Riley Stoker Corp.*, 526 F.2d 1174, 1179 (6th Cir. 1975), the Sixth Circuit, applying Ohio law, found the following language "insufficient to relieve [the seller] from liability for its own negligence":

> . . . [A]ll responsibility for operation rests with the Purchaser. [The seller] shall not be liable for any claims, losses, labor, expenses or damages, direct or consequential, resulting directly or indirectly from the service performed, or for other consequential loss or damage of any nature arising from any cause.[15]

The Court of Appeals said:

> Although [the seller] contends that the provision is sufficient to relieve it from liability for loss or damage resulting from "any cause," this general phrase is limited in its scope by the more specific terminology which precedes it. (Slip opinion at 7.)

Under this kind of analysis, the present general language of "in no event are we to be liable" would be limited in its scope by the more specific terminology of "[o]ur lia-

---

14. In *Southwest Forest Industries, Inc. v. Westinghouse Electric Corp.*, 422 F.2d 1013 (9th Cir. 1970), the Ninth Circuit, also applying Pennsylvania law, came to the opposite conclusion of the *Neville* court, holding that "Westinghouse shall not be liable for consequential damages" precluded full negligence liability. However, whereas the Third Circuit opinion carefully analyzed the law of Pennsylvania, one of the states in its circuit, the Ninth Circuit opinion

merely string-cited Pennsylvania decisions in support of general construction principles, and is not persuasive.

15. The seller in this case relied upon *Cyclops Corp. v. Home Ins. Co.*, 389 F.Supp. 476, 478 (W.D.Pa.1975), also applying Ohio law, but in *Cyclops* the exculpatory language expressly applied "in contract or in tort."

bility under this contract" which precedes it.

In accordance then with what appear to be the most relevant cases,[16] we conclude that the seller's exculpatory language in the present case does not impose limitations on its liability for negligence.

In the first place, the exculpatory provision appears under the heading "Warranty." The first five paragraphs under that heading deal with the subject of warranty. The exculpatory language comprises the sixth and last paragraph, where the reader would expect to find further reference to the subject of warranty.

Secondly, the critical provision begins with the words "[o]ur liability *under this contract* is limited" (emphasis added). In the same sentence and without the use of any punctuation follow the words "and in no event are we to be liable," which lead the reader to believe that the meaning is that "in no event are we to be liable under this contract." This is an application of the *Bahamas* rule that the subsequent general phrase is modified by the preceding specific terminology. At least it is not clear, explicit and unequivocal here that such a natural meaning was not intended.

Thirdly, the exculpatory language does not contain the words "negligence," "tort" or their cognates. As we have seen, Illinois does not require explicit use of such words but failure to use them is one factor to be weighed in interpreting the language employed.

Fourthly, the superfluity argument of *Gates* is not applicable.

Fifthly, the use of the words "consequential damages" refers to contract rather than tort damages. The Illinois enactment of the Uniform Commercial Code provides that the "measure of damages for breach of warranty" may in "a proper case" include any incidental and consequential damages. Ill.Rev.Stats., c. 26, § 2–714(2) and (3). "Consequential damages resulting from the seller's *breach*" are defined in § 2–715(2). Finally, § 2–719(3) provides that "[c]onsequential damages may be limited or excluded . . . ." by agreement. At least two Courts of Appeal have questioned whether the contract language of the U.C.C. has any applicability whatever to negligence actions.[17]

Although "special damages" are used in both a tort (for example, in libel actions)

---

**16.** Applying both Pennsylvania and Michigan law, the district court in *U. S. Fibres, Inc. v. Proctor & Schwartz, Inc.,* 358 F.Supp. 449 (E.D. Mich.1972) held that a provision reading "[t]he Company shall not be liable for proximate, incidental, consequential or other damages . . . ," together with a provision that the buyer's "exclusive remedy" was recovery of the purchase price of the machinery, *did* apply to limit negligence recovery (358 F.Supp. at 465), but the court upon subsequent trial found the seller not liable for negligence. 358 F.Supp. 467. Upon appeal the Sixth Circuit concluded that the finding of no negligence made consideration of the district court's interpretation of the limitation provision unnecessary. *U. S. Fibres, Inc. v. Proctor & Schwartz, Inc.,* 509 F.2d 1043 (6th Cir. 1975).

**17.** In *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205, 1218 (3d Cir. 1970), Judge Adams said:

.   .   . [T]here is some question whether the Uniform Commercial Code is applicable to this point, since here we have a jury finding of negligence as distinguished from a mere breach of a warranty  .   .   .

And again at 1221, n. 25:

The rules of Section 2–719 apply to limiting or altering the measure of damages recoverable under the Uniform Commercial Code and may not be directly applicable to limitation of liability for negligence.

In *Jig the Third Corp. v. Puritan Marine Ins. Underwriters Corp.,* 519 F.2d 171, 178–179 (5th Cir. 1975), Judge Goldberg said:

We do not read the Uniform Commercial Code as a categorical imperative exiling or outlawing the law of negligence between contracting parties. While there may be no magic words which are necessary to grant absolution for negligence, we have in this contract no plausible syllabization for such grace.   .   .   . Limiting contractual language and limitless liability predicated upon negligence can coexist in situations such as this one, and this duality can only be foresworn by language which will bear no interpretation other than that the seller shall not be held responsible for his own negligent wrongdoing.

and contract context, many courts have concluded that when "special" is coupled with "consequential" as here in "special or consequential damages," the two terms are synonymous.[18]

By using contractual measures of damages the seller did not clearly indicate any intent to foreclose tort damages.

Sixthly, there is evidence in the record amply supporting the foreseeability of the harm necessary in order to find liability for negligence damages. In one report by the seller's field engineer, he stated after an inspection tour of the buyer's prior installations that "[i]t is the first venture by Komarek-Greaves into the Potash field and considerable prestige and future business is pending the success of this installation." This kind of evidence does not tend to support an interpretation of the exculpatory provision to the effect that the seller is not intended to be liable for loss of profits resulting from its negligence.

Finally, applying the weight of Illinois law to the contract and "all of its language and provisions," we cannot say that the parties by "clear and explicit language" or by intention "expressed in unequivocal terms" intended that the exculpatory provision be applied to the seller's negligence as well as to its contractual breaches.

### III

The jury verdict established the seller's negligence in the specification, design, engineering and manufacturing of the speed reducers sold to the buyer. In Part II, we have held that the exculpatory language in the parties' contract can not be read to include limitations on damages resulting from negligence. It remains for us to apply this result, rather than the opposite result applied by the trial court, to determine what damages flow proximately from the seller's negligence. In doing so we are bound by the trial court's findings of fact unless they are clearly erroneous.

The buyer introduced evidence that it was damaged $331,298 in so-called out-of-pocket expenses and $156,940 in lost profits or a total amount of $488,238. The court awarded the buyer damages of only $25,672.70. A portion of the discrepancy is due to the trial court's holding as a matter of law that the buyer could not recover loss of profits or special or consequential damages. Therefore in those instances in which the court's only, or only viable, reason for denying an item of damages was that those damages constituted loss of profits or special or consequential damages, we must determine whether such damages are to be awarded to the buyer.

Once we have stricken the supposed limitations on negligence damages which the trial court erroneously imposed, we are remitted to the ordinary rules for determining negligence damages—that is, those foreseeably and proximately resulting from the injury, which in this case consisted of the defective speed reducers.

The Illinois rule is that in order to impose liability on a tort feasor it must be reasonably foreseeable to an ordinarily prudent person that injury will reasonably and probably result from his failure to exercise ordinary care, and it is not essential, in order to hold him liable for the injury which proximately results from his failure to exercise ordinary care, that he foresee either the precise injury that results therefrom or the manner in which it occurs.[19]

---

18. *Monarch Brewing Co. v. George J. Meyer Mfg. Co.,* 130 F.2d 582, 585 (9th Cir. 1942); *Hycel, Inc. v. American Airlines, Inc.,* 328 F.Supp. 190, 193 (S.D.Tex.1971).

19. "If a reasonably prudent person might, and ordinarily would, foresee that the omission to do a certain act or the commission of an act in a certain way would likely result in injury to another, and injury to another does follow as a result thereof, such act of omission or commis-

sion is negligence, and the proximate cause of the injury." *Wintersteen v. National Cooperage & Woodenware Co.,* 361 Ill. 95, 105, 197 N.E. 578, 583 (1935).

"The injury must be the natural and probable result of the negligent act or omission and be of such a character as an ordinarily prudent person ought to have foreseen as likely to occur as a result of the negligence, although it is not essential that the person charged with negli-

The trial court granted the buyer a portion of two categories of damages. He awarded $20,754.09 of $46,355.61 sought for out-of-pocket expenses incurred prior to replacement of the speed reducers; he also awarded $4,918.61 of $6,198.39 costs and expenses of F. H. Stratman. In both instances, the court eliminated (1) a profit factor included in *per diem* charges for services of buyer's personnel and (2) "client entertainment" expenses. Expenses relating to start-up as opposed to break-down were also eliminated. Finally the court denied recovery of $15,471.55 for Sylvite back charges on the ground that they were "not foreseeable." We cannot say that any of these reductions were clearly erroneous and hence the awarding of a total of $25,672.70 for these two items is affirmed.

The damage item of $4,305 for oil coolers was found by the trial court to be "the proximate result of Litton's negligence" and should be added to buyer's damage.

The $1,412, representing one-half of Spaetgen's fee, which was found by the trial court to "be borne equally by the parties," should be denied inasmuch as the court's finding is not clearly erroneous.

The $74,216 for replacement of speed reducers by those manufactured by Philadelphia Gear Works was found by the trial court to be "proximate result of Litton's negligent design." The court denied recovery because of the exculpatory clause, which we have held to be inapplicable, and because "Berwind did not give Litton an opportunity to participate in . . ." the replacement or repair. Restatement of Torts provides in § 919(2) that "[a] person who has already suffered injury by the tort of another is entitled to recover for expenditures reasonably made or harm suffered in a reasonable effort to avert further harm." The cost of repair, even when unsuccessful, is upon the tortfeasor. The Comment on § 928(a) states that "[t]he risk of reasonable but unsuccessful attempts to repair is upon the tortfeasor. . . ." This item of $74,216 should be added to the buyer's damages.

The buyer has argued that it is entitled to $133,650, which is the purchase price of nine speed reducers. The trial court held that this was not a proper element of negligence damages inasmuch as the buyer is recovering for repair and replacement of these items. The seller has also argued that these nine units were not returned by the buyer to the seller despite a contractual provision requiring return. We agree that to allow this item in full would result in a double recovery by the buyer. However, the evidence shows that one speed reducer was delivered to replace a reducer which failed at Kerr-McGee. To fail to award the buyer damages for a replacement unit would be to require the buyer to pay twice for the benefit of one unit. Therefore the buyer's damages should be increased by the cost of one replacement unit or $14,850.

The trial court found that the Falconbridge testing of $8,895 was a "cost of sale"; that the Mechanical Technology, Inc. expenses of $2,551 involved testing unrelated to the litigation; and that the $1,000 Falk testing "was not the proximate result of Litton's negligence." We cannot say that these findings were clearly erroneous.

The buyer sought three separate items of damage due to the refusal of RKW to purchase a compacting installation: (1) cost of the rejected unit of $47,150; (2) profit on rejected unit of $52,000 and (3) loss of sale of parts for unit of $51,300. The trial court denied the first item on the ground that this "is merely Berwind's failure to sell a unit" and proof of causation was lacking. If no causation existed between the seller's negligence and the failure to sell the RKW unit, then all three items related to the RKW unit must also fail. The court's finding on the RKW unit is not clearly erroneous.

Because of the trial court's position that the exculpatory provision applied to limit loss of profits, he made no express findings relating to the lost profits item of $53,640

gence should have foreseen the precise injury which resulted from his act." *Neering v. Illi-*

*nois Central Railroad Co.,* 383 Ill. 366, 380, 50 N.E.2d 497, 503 (1943).

relating to Sardamag and sought as an additional damage item by the buyer. Therefore we do not have a sufficient factual basis upon which to determine whether the buyer is entitled to this item or not as a proximate result of the seller's negligence.

The seven items of damages under the counterclaim are incorrectly totaled in the judgment order. Instead of adding up to $82,662.50, the correct amount should be $82,617.50.

The judgment in favor of Berwind against Litton is increased in amount from $25,672.70 to $119,043.70.

The judgment in favor of Litton against Berwind is reduced in amount from $82,662.50 to $82,617.50.

The issue of lost profits is remanded for further proceedings consistent herewith.

MODIFIED AND REMANDED.