TYLER ENTERPRISES OF ELWOOD, INC., Plaintiff-Appellant, v. JACK SKIVER, d/b/a Ohmtemp, Defendant and Cross-Appellant (Eli Lilly and Company, Defendant-Appellee and Cross-Appellee).

Third District    No. 3—93—0501

Opinion filed May 4, 1994.—Rehearing denied June 2, 1994.

Costigan & Wollrab, P.C., of Bloomington (Robert W. Neirynck and Kevin P. Jacobs, of counsel), for appellant Tyler Enterprises of Elwood, Inc.

O'Connor, Schiff & Myers, of Chicago (John Grove, of counsel), for appellant Jack Skiver.

Kathleen A. Ravotti, of Sidley & Austin, of Chicago (Rick L. Jett and Stephen V. Beyer, of counsel), for appellee.

JUSTICE STOUDER delivered the opinion of the court:

This is a suit for damage to plaintiff's property resulting from a fire that occurred at the plaintiff's plant. The plaintiff, Tyler Enterprises of Elwood, Inc. (Tyler), filed a three-count complaint against defendants Jack Skiver, d/b/a Ohmtemp; Robertshaw Controls Company; and Eli Lilly and Company (Lilly). The counts against Skiver and Robertshaw Controls are not involved in this appeal. Count III sought relief against Lilly on a strict liability theory. Tyler later amended the complaint to add a count IV against Lilly, alleging wilful and wanton misconduct. The trial court granted summary judgment in favor of Lilly on counts III and IV, and plaintiff now appeals to this court.

On appeal, Tyler raises two issues for our consideration: (1) whether an exculpation clause or a damage limitation clause bars an action for property damage under the doctrine of strict liability in tort where the parties are commercial entities, and (2) whether the record raises a genuine issue of material fact as to whether Lilly was guilty of wilful and wanton misconduct. Defendant Skiver has filed a cross-appeal, arguing that it was improper for the trial court to enter a finding as to proximate cause in its ruling on the summary judgment motion. We reverse in part and affirm in part.

Tyler is a small fertilizer manufacturer located in Elwood, Illinois. In 1985, Tyler entered into an agreement with Elanco Products Company, a division of defendant Lilly, to purchase a herbicide known as Balan Technical (Balan). The Balan was to be incorporated by Tyler into a combination fertilizer-herbicide formulation that Tyler would then sell. Balan was available from Lilly in three formulations: solid, liquid concentrate, and milled concentrate. Tyler chose to receive solid Balan.

Lilly required Tyler to execute a two-page sales agreement prior to the shipment of any Balan. The agreement contained clauses at the bottom of the first page under "Other terms" that purported to exculpate Lilly from liability for consequential damages and limit any recovery against Lilly to the purchase price of the chemicals.

The agreement was originally signed in 1985 and was thereafter renewed annually.

Tyler liquified the solid Balan at its plant before incorporating it into its own product. Tyler initially liquified the Balan by chiseling pieces of it out of the barrels in which it was shipped and then heating the pieces overnight in large vats at approximately 180 degrees Fahrenheit. It then switched to a different method, using drum heaters, in 1988. The heating equipment was ordered from Jack Skiver, d/b/a Ohmtemp. Tyler supplemented the drum heaters with flexible tubing that ran underneath them. A heated mixture of ethylene glycol and water was pumped through the tubes.

A fire occurred at Tyler's plant on February 1, 1989, while Tyler was heating two barrels of Balan and one barrel of Trifluralin using the drum heaters. That morning, at approximately 8 a.m., Tyler employee Timothy Quigley set the thermostat on the heaters somewhere between 450 and 500 degrees Fahrenheit and then left the room. According to Warren Shafer, Tyler's general business manager at the time, the normal procedure was to set the heaters at around 450 or 500 degrees and then check the heating process every hour. When the Balan started to liquify, the heaters were supposed to be turned down to 160 or 180 degrees. Quigley was in the room again briefly at approximately 9:30 or 10 a.m., but did not check the melting process. He noticed nothing unusual. At approximately 12:30 p.m., Quigley opened the door to the room and found it filled with yellowish smoke. He deactivated electrical power to the heaters and turned on an exhaust fan in the wall.

Shafer, and another employee, Scott Couch, went outside to try and determine what was going on inside the room by looking in a window. They could not see anything, so Couch broke the window. Smoke started to pour out, and Shafer yelled for someone to call the fire department. Couch went back inside and looked into the room that the smoke was coming from. Couch saw a puddle of liquid on the floor that extended under one of the drum heaters. The entire top of the puddle was in flames. Couch remembered the flames being a dark red-orange color. Couch emptied a fire extinguisher into the room and shut the door. The Tyler plant was eventually destroyed by the fire.

The deposition testimony is conflicting as to Tyler's knowledge of whether Balan was flammable. Lilly had supplied Tyler with material safety data sheets (MSDS) for Balan. The first section of the MSDS for Balan includes the following provisions:

"F.        Auto-Ignition Temperature
           Sublimes without ignition
 G.        Flashpoint
           Not applicable
 H.        Explosive Limit
           0.375 ounce per cubic foot."

The second section is entitled "Stability and Storage" and states: "Avoid extreme heat or cold. Do not store near heat or open flame. Store in original container only. Do not contaminate water, food, or feed by storage or disposal." Section III, "Unusual Fire and Explosion Hazards," merely states "None known." Finally, Section VI is entitled "Fire Fighting Information" and states the following:

> "Use water, $CO_2$ or dry chemicals to extinguish. Will emit toxic fumes as it burns. Wear full protective clothing and use self-contained breathing apparatus. Non-essential personnel should be restricted from area of intense smoke. Do not allow water run-off from fire site to enter nearby streams, ponds or lakes. Keep containers cooled with water spray."

Warren Shafer's understanding was that Balan was not flammable. He reached this conclusion by reading the MSDS. He also remembered talking with someone at Elanco who told him that Balan incinerates but does not flame. According to Shafer, the Tyler procedure was to keep the Balan below either 180 or 190 degrees because at higher temperatures it would crystallize.

Timothy Quigley also read the MSDS and gained the impression that Balan would not ignite. He concluded this because of the statement that Balan did not have a flashpoint. He also remembered the MSDS stating that Balan was not flammable. (It contains no such statement.) He believed the statement "Not applicable" under "Flashpoint" meant that Balan would not burn no matter how hot it got. The statement, "Will emit toxic fumes as it burns" did not suggest to him that Balan would burn.

According to an expert witness retained by the plaintiff, Robert Bambenek, Balan burns, autoignites, and has a flashpoint. He also stated that it is probably flammable. Bambenek found the MSDS to be misleading because it tended to indicate that Balan would not burn. He stated that the statements in the MSDS that Balan sublimed without ignition and did not have a flashpoint were inaccurate. Bambenek believed the MSDS should have specified a melting point for Balan and also a warning not to heat it within 50 degrees of its flashpoint.

Another expert witness retained by the plaintiff, Robert Stanis, testified in his deposition that section VI of the MSDS was conflicting

with section I. Section VI stated that Balan emits toxic fumes when it burns, but section I stated that it sublimed without ignition. According to Stanis, saying that there was no autoignition temperature meant that Balan would not ignite no matter what temperature it is subjected to. Stanis also said that the MSDS should have specified a flashpoint and should have alerted Tyler to the safe temperatures to which Balan could be subjected for purposes of liquefaction.

Elanco representative Steven Springer testified that Tyler was supplied with a technical chemical bulletin for Balan, which included safety information on the three formulations of Balan available to commercial purchasers. It was stated in the bulletin that Balan was a deep red, nonviscous liquid in the molten state, had a melting range of 147 to 151 degrees, and a boiling point of 250 to 252 degrees. It also stated that Balan had a flashpoint greater than 185 degrees. Springer had also orally advised Tyler that it should not allow Balan to reach a temperature in excess of 185 degrees, approximately 35 degrees above its melting point. According to Springer, if Balan was heated above 185 degrees for an extended period of time, nitrosamines could form. Nitrosamines are a different chemical chain than Balan and would contaminate the product. Another Elanco employee, Ronald Cassell, testified that Balan could also exothermally degrade if heated above 215 degrees centigrade. An exothermic reaction is one that gives off heat.

Shafer did not recall getting the bulletin. He testified in his deposition that he might have gotten it, but he did not remember. The file in which it would have been kept was destroyed in the fire.

In 1984, tests were conducted on Balan by Hazards Research Laboratory. The results were contained in HRC Report 5795A, dated October 16, 1984, and HRC Report 5795C. The reports were made to Lilly Research Laboratories. Tyler did not receive copies of the reports. According to HRC Report 5795A, Balan is capable of manifesting violent exothermic reactions initiating in the range of 225 degrees centigrade in continuous heating experiments. The exothermic reactions were accompanied by large increases in pressure. The report stated that Balan should be considered extremely hazardous.

Lilly approved of the use of the Ohmtemp drum heaters as a method for heating Balan. Ronald Cassell told Lilly sales representatives that the Ohmtemp drum heaters were another method of melting Balan directly in the barrels in which the product was shipped.

Counts III and IV of Tyler's complaint were directed against Lilly. Count III was brought on a theory of strict products liability,

and count IV alleged wilful and wanton misconduct. Count III alleged that the Balan was in an unreasonably dangerous condition when it left Lilly's control. It was alleged to be unreasonably dangerous for three reasons: (1) it contained no warning that Balan was combustible; (2) it failed to inform the user of the ignition temperature; and (3) it failed to warn the user of any fire hazards associated with the heating of Balan for manufacturing purposes. Count IV alleged 10 specific acts of wilful and wanton misconduct. Count IV was added to the complaint by way of amendment after the trial court granted partial summary judgment in favor of Lilly.

Lilly argued in its original motion for summary judgment that the exculpatory provisions in the formulating agreement unambiguously shifted the risk of the occurrence to Tyler. In the alternative, Lilly argued that it was entitled to summary judgment on the issue of damages because the agreement unambiguously limited Tyler's recovery to the price of the Balan at issue. What is most interesting about Lilly's motion for summary judgment is the language it deleted from its quotation of the exculpatory clause. That will be addressed later.

Following a hearing, the circuit court entered an order denying without prejudice Lilly's motion for summary judgment on the risk-shifting issue. The court found that more facts were needed regarding the nature of the parties and the business practices and relationship of the parties and the industry. The court granted Lilly's motion for summary judgment on the issue of damages, finding that Tyler's recovery was limited as stated in the agreement.

After more depositions were taken and Tyler had amended its complaint to add the wilful and wanton count, Lilly again moved for summary judgment. Lilly renewed its argument with respect to the risk-shifting agreement. As to count IV, Lilly argued that the undisputed facts demonstrated that there was no basis for any allegations of wilful and wanton misconduct. At the same time it considered Lilly's motion for summary judgment, the trial court also considered a motion by Tyler to vacate the order previously entered that granted partial summary judgment to Lilly. Initially, the court denied Tyler's motion, finding that the original order was correct. The court then granted summary judgment to Lilly on both counts.

The trial court framed the issues as whether a commercial seller of a product who sells to a commercial buyer can shift the risk of a defect in the product to the commercial buyer, and whether the commercial seller can exculpate itself from liability for strict liability when selling to a commercial buyer. The court found that the agreement was a valid risk-shifting agreement that shifted the risk

of advice about the use of the product in processing, manufacture, or formulation to the formulator. The court also found that any damages would be limited to the contractual damages set forth in paragraph one of "Other Terms" of the formulating agreement. Finally, the court concluded that any deficiency in the warnings given by Lilly was not the proximate cause of the fire, and that the proximate cause was the failure of a thermostat in the barrel heating system. With respect to count IV, the court found that the allegations were not sufficient to support a finding of wilful and wanton misconduct. The court concluded that count IV was an attempt to skirt the court's earlier ruling on the contract. Tyler has now appealed from the court's entry of summary judgment in favor of the defendant.

This court reviews summary judgment orders *de novo*. (*Farmers State Bank v. National Bank* (1992), 230 Ill. App. 3d 881, 596 N.E.2d 173.) Summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. (735 ILCS 5/2—1005(c) (West 1992).) It is the duty of the court to construe the evidence strictly against the movant and liberally in favor of the opponent. *Quality Lighting, Inc. v. Benjamin* (1992), 227 Ill. App. 3d 880, 592 N.E.2d 377.

The plaintiff first argues on appeal that neither an exculpation clause nor a damage limitation clause will bar an action for property damage under the doctrine of strict liability in tort, even where the parties are commercial entities. The question has already been answered by the Illinois courts in situations where consumers suffered personal injuries. In *Haley v. Merit Chevrolet, Inc.* (1966), 67 Ill. App. 2d 19, 214 N.E.2d 347, the driver of an automobile and her passenger brought an action against the manufacturer of the automobile, the automobile dealer, and the tire manufacturer for injuries they sustained when the driver lost control of the vehicle due to an allegedly defective steering column and allegedly defective tires. The defendant automobile dealer argued that the terms of an express warranty given to the plaintiffs relieved it from liability and limited its obligation to repair or replacement of parts in certain limited situations. The court cited the supreme court's decision in *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182 (the case in which our supreme court adopted the theory of strict liability in tort for defective products, based on section 402A of the Restatement (Second) of Torts (1965)) for the proposition that sound reasons of public policy justified the extension of strict liability to the manufacturers of products whose defective condition makes them unreasonably dangerous to the user. The *Haley* court then concluded:

"To allow the dealer to limit, by contract, his tort liability for such defects in an automobile to the repair or replacement of defective parts would defeat those reasons. We conclude, therefore, that the attempted elimination by the dealer of all obligations other than replacement of defective parts is violative of public policy and void[.]" (*Haley*, 67 Ill. App. 2d at 30, 214 N.E.2d at 353.) In *Sipari v. Villa Olivia Country Club* (1978), 63 Ill. App. 3d 985, 380 N.E.2d 819, a lessee of a golf cart brought an action in strict liability against the lessor and alleged manufacturer of the cart for injuries he sustained when the cart overturned on him. The defendant lessor argued that an exculpation clause on the rental ticket precluded its liability. The court disagreed, finding that strict tort liability is imposed by operation of law as a matter of public policy for the protection of the public, and that "the one liable cannot contract away his own responsibility for having placed a defective product into the mainstream of public use." *Sipari*, 63 Ill. App. 3d at 990, 380 N.E.2d at 823. See also *Diedrich v. Wright* (N.D. Ill. 1982), 550 F. Supp. 805 (plaintiff injured in parachute jump brings action in negligence and strict liability against parachute center, court concludes that a release form signed by plaintiff exonerating defendant from liability for any injuries cannot bar an action based on strict liability).

The issue raised in this case is whether the reasoning expressed in the cases cited above would also apply in this situation, where the claim is for property damage and the action is between two commercial entities. No Illinois court has of yet answered this question. Other courts have taken various approaches to the problem. For instance, in *Kaiser Steel Corp. v. Westinghouse Electric Corp.* (1976), 55 Cal. App. 3d 737, 748, 127 Cal. Rptr. 838, 845, the court held that the doctrine of products liability did not even apply between parties who (1) deal in a commercial setting; (2) from positions of relatively equal economic strength; (3) bargain the specifications of the product; and (4) negotiate concerning the risk of loss from defects in it. In *Salt River Project Agricultural Improvement & Power District v. Westinghouse Electric Corp.* (1984), 143 Ariz. 368, 694 P.2d 198, the supreme court of Arizona adopted the four *Kaiser* factors mentioned above, but instead of using them to determine whether the doctrine of products liability applied, the court used them to determine if an exculpatory clause was valid. The Tenth Circuit Court of Appeals has held, applying Oklahoma law, that exculpatory clauses are not effective to disclaim strict liability, even in a commercial setting. (*Sterner Aero AB v. Page Airmotive, Inc.* (10th Cir. 1974), 499 F.2d 709; *In re Jones* (10th Cir. 1986), 804 F.2d 1133.) Other courts have

held that exculpatory clauses are effective to disclaim strict liability in a commercial setting. See *Idaho Power Co. v. Westinghouse Electric Corp.* (9th Cir. 1979), 596 F.2d 924 (disclaimer effective between two large corporations of relatively equal bargaining strength); *Keystone Aeronautics Corp. v. R.J. Enstrom Corp.* (3d Cir. 1974), 499 F.2d 146 (freely negotiated and clearly expressed waiver of section 402A effective between business entities of relatively equal bargaining strength); *McDermott, Inc. v. Clyde Iron* (5th Cir. 1992), 979 F.2d 1068 (contractual provisions waiving negligence and strict liability claims are enforceable under New York law if plain and precise; clause in this case mentions "tort" and "strict liability" and is enforceable).

Our review of the record in this case leads us to the conclusion that the resolution of this important policy question by an Illinois court will have to wait for another case. In order for us to resolve this appeal, it is not necessary for us to answer the question of whether exculpatory clauses are effective to disclaim strict liability between commercial entities when only property damage is involved. Whatever the answer to that question, the specific exculpatory clauses involved in this case are not effective to preclude an action in strict liability.

The general rule regarding exculpatory clauses in Illinois is that such clauses will be enforced unless (1) it would be against the settled public policy of the State to do so, or (2) there is something in the social relationship of the parties militating against upholding the agreement. (*Harris v. Walker* (1988), 119 Ill. 2d 542, 519 N.E.2d 917.) However, our supreme court also held the following in *Scott & Fetzer Co. v. Montgomery Ward & Co.* (1986), 112 Ill. 2d 378, 493 N.E.2d 1022:

> "Such clauses are not favored [citation] and are to be strictly construed against the party they benefit [citation], especially when that party was also the draftsman [citation]. Such clauses must spell out the intention of the parties with great particularity and will not be construed to defeat a claim which is not explicitly covered by their terms." *Scott & Fetzer*, 112 Ill. 2d at 395, 493 N.E.2d at 1029-30.

In the instant case, the exculpatory provisions of the formulating agreement benefit Lilly, and the formulating agreement was one of Lilly's preprinted forms. Therefore, we must strictly construe the exculpatory provisions of the agreement against Lilly. There is no question but that a claim for strict liability is not "explicitly covered by [the agreement's] terms." The first of the exculpatory clauses in the agreement begins: "No claim of any kind by Formulator, *whether for delay in delivery, for any failure to deliver, or for any delivery of*

*nonconforming Technical Chemicals,* shall be greater in amount than the purchase price of the Technical Chemicals in respect to which such claim is made." (Emphasis added.)

Lilly, in its original motion for summary judgment, replaced the above emphasized language with three dots. It is no wonder, since that language clearly limits the preceding language, "No claim of any kind ***." The first sentence of clause one clearly does not apply to a claim for strict liability.

The next two sentences are more difficult. They provide:

"In no event shall Elanco be liable for consequential damages, whether or not arising out of negligence. Elanco's liability and Formulator's exclusive remedy for any cause of action arising out of this contract, including negligence, is expressly limited to Formulator's option to replacement of, or repayment of the purchase price for, the Technical Chemical with respect to which damages are claimed."

The references to "negligence" are not helpful. A party's negligence is irrelevant in a strict liability action. (*Sorrentino v. Waco Scaffolding & Shoring Co.* (1976), 44 Ill. App. 3d 1055, 358 N.E.2d 1244.) Strict liability goes to the condition of the product and not to conduct of the manufacturer. (*Christopherson v. Hyster Co.* (1978), 58 Ill. App. 3d 791, 374 N.E.2d 858.) With regard to the exclusion of consequential damages, the term "consequential damages" refers to contract rather than tort damages. (*Berwind Corp. v. Litton Industries, Inc.* (7th Cir. 1976), 532 F.2d 1.) Section 2—715 of the Uniform Commercial Code (810 ILCS 5/2—715 (West 1992)) defines consequential damages as:

"(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty."

Here, the plaintiff is not alleging property damage resulting from breach of warranty, but rather is seeking to apply the doctrine of strict products liability.

Finally, the exclusive remedy provision purports to limit liability for any cause of action *"arising out of this contract,* including negligence."* (Emphasis added.) In *Berwind,* a case involving commercial entities decided under Illinois law, the Seventh Circuit Court of Appeals held, *inter alia,* that the words "[our] liability *under this contract* is limited" (emphasis in original) could apply to negligence based upon contractual duties, but not negligence based upon independent duties. (*Berwind,* 532 F.2d at 6-7.) In the case at

bar, the exclusive remedy provision could be read as precluding actions based upon breach of contract and negligence actions based upon a contractual duty, but could not be read as precluding a strict liability claim. An action for strict liability does not arise out of contract, but rather is based on an independent duty. That duty is not to place into commerce articles that are unreasonably dangerous when used for their intended purpose. (*Ruggeri v. Minnesota Mining & Manufacturing Co.* (1978), 63 Ill. App. 3d 525, 380 N.E.2d 445.) For all of the above reasons, the first exculpatory clause cannot, as a matter of law, preclude a claim for strict liability.

The second clause reads:

> "If Elanco furnished technical, financial or other advice to Formulator, whether or not at Formulator's request, with respect to any matters including, but not limited to processing, further manufacture, other use or resale of Technical Chemicals, Elanco shall not be liable for, and Formulator assumes all risk of, such advice."

In its appellate brief, Lilly blatantly misrepresents this clause as providing that, "Elanco would assume no duty to advise manufacturers about any risks involved in 'processing' or 'further manufacture' of Balan, as conducted by these manufacturers." Clearly, that is not what the second clause provides. Rather, it merely shifts the risk of any such advice to Tyler. We are uncertain why the trial court relied on this clause in its summary judgment order, but we find it irrelevant to a cause of action based on strict liability. For the reasons stated, we reverse the circuit court's entry of summary judgment in favor of the defendant Lilly on count III of the plaintiff's complaint.

In count IV of its complaint, plaintiff alleged 10 specific acts of wilful and wanton misconduct on the part of defendant Lilly. Tyler alleged that Lilly:

> "(a) Failed to warn the plaintiff that Balan was flammable;
>
> (b) Failed to warn the plaintiff that Balan had an autoignition temperature;
>
> (c) Told the plaintiff that Balan did not have an autoignition temperature;
>
> (d) Failed to warn the plaintiff that Balan should not be heated above a specific temperature or that a fire could occur;
>
> (e) Told plaintiff that Balan did not burn;
>
> (f) Failed to warn the plaintiff that Balan was combustible;
>
> (g) Failed to warn the plaintiff of the ignition temperature of Balan;
>
> (h) Failed to warn the plaintiff of any fire hazards associated with heating the Balan for the purpose of liquefying it;
>
> (i) Failed to warn the plaintiff of fire hazards associated with

heating Balan as described in the reports of Hazards Research Corporation;

(j) Provided plaintiff with a Material Safety Data Sheet that was vague and misleading."

While we disagree with the trial court that count IV was virtually identical to count III with the addition of boilerplate wilful and wanton conduct language, we agree that summary judgment in favor of Lilly was proper on this count.

In *Burke v. 12 Rothschild's Liquor Mart, Inc.* (1992), 148 Ill. 2d 429, 593 N.E.2d 522, the supreme court held that, "Willful and wanton conduct is found where an act was done ' "with actual intention or with a conscious disregard or indifference for the consequences when the known safety of other persons was involved." ' " (*Burke*, 148 Ill. 2d at 451, 593 N.E.2d at 532, quoting *Lynch v. Board of Education of Collinsville Community Unit District No. 10* (1980), 82 Ill. 2d 415, 430, 412 N.E.2d 447, quoting *Myers v. Krajefska* (1956), 8 Ill. 2d 322, 328-29, 134 N.E.2d 277.) The *Burke* court further stated that a determination of wilful and wanton conduct will be based on the facts of any given case. *Burke*, 148 Ill. 2d at 451, 593 N.E.2d at 532.

■ Our review of the record, including the pleadings and depositions, indicates that the facts of this case would not support a finding of wilful and wanton conduct on the part of Lilly. No facts were established that would support a finding that Lilly intentionally harmed Tyler. The question then becomes whether Lilly acted with a conscious disregard or indifference for the consequences when the known safety of others was involved. We do not believe the record supports such a finding. There is a fact question as to the adequacy of the warnings supplied by Lilly. Nevertheless, Lilly did advise Tyler not to heat the Balan above 185 degrees, the MSDS stated that Balan burns and advised not to store it near an open flame, and the technical chemicals bulletin contained information regarding the flashpoint and melting point of Balan. In light of the above facts, we cannot conclude that Lilly acted with a conscious disregard for, or indifference to, the safety of Tyler. Therefore, we affirm the trial court's entry of summary judgment in favor of Lilly on count IV.

■ Finally, defendant Jack Skiver, d/b/a Ohmtemp, argues that the court improperly considered and made findings relative to the issue of proximate cause in its summary judgment order. In its order, the court found that the failure of the thermostat in the barrel heating system was the proximate cause of the fire. Skiver asked the court in a motion to vacate those findings because Skiver did not present its evidence on that issue. The trial judge denied the motion

on the basis that Skiver was trying to get a "second bite of the apple." We disagree, because Skiver did not get a first bite, nor did he know it was time to take that bite. Lilly's motion for summary judgment only addressed the issues of the validity of the exculpatory clause and Tyler's right to recover against Lilly under a theory of wilful and wanton misconduct. Skiver did not participate in the hearing on that motion because he did not have any evidence on those issues and the court was ruling on the counts of the complaint against Lilly. Skiver had no way of knowing that the court was going to decide the issue of proximate cause and has not had a chance to present evidence on that issue. We therefore conclude that the trial court's finding of proximate cause was premature and erroneous.

For the reasons stated, the judgment of the circuit court of Will County granting summary judgment in favor of defendant Lilly on count III of the plaintiff's complaint is reversed; the judgment is affirmed with respect to the entry of summary judgment in favor of Lilly on count IV. The cause is remanded for further proceedings consistent with the views expressed in this opinion.

Affirmed in part; reversed in part and remanded.

BARRY and BRESLIN, JJ., concur.